# EXHIBIT F

STATE OF NORTH CAROLINA

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

WAKE COUNTY

FILED

FILE NO:

SHAWNA CANNON LEMON,

Plaintiff,

v.

COMPLAINT

MYERS BIGEL, P.A., formerly known
as "Myers Bigel & Sibley, P.A." and
"Myers Bigel Sibley & Sajovec, P.A.,"
LYNNE A. BORCHERS, and
UNNAMED OTHERS,

Defendants.



NOW COMES plaintiff SHAWNA CANNON LEMON, by and through

counsel, and pursuant to N.C. R. Civ. P. 8, complaining against defendant MYERS

BIGEL, P.A. (individually "MB" and collectively "Defendants"), formerly known as

"Myers Bigel & Sibley, P.A." and as "Myers Bigel Sibley & Sajovec, P.A." and

LYNNE A. BORCHERS (individually "Borchers" and collectively "Defendants"), and

UNNAMED OTHERS (individually "Others"); Lemon alleges and says as follows:

<u>PARTIES AND JURISDICTION:</u>

1.      At all times relevant herein, Shawna Cannon Lemon ("Lemon") has

been a citizen and resident of Wake County, North Carolina. Lemon is a black

female of African-American descent.

2.      At all times relevant herein, defendant Myers Bigel, P.A. ("MB") has

been a professional association organized and existing under the laws of North

Carolina for the purpose of providing legal services for its clients with its primary

place of business in Wake County, North Carolina. As such, MB is empowered to sue and be sued.

3.      Prior to December 14, 2016, MB was duly incorporated as "Myers Bigel & Sibley, P.A." On or about December 14, 2016, MB filed articles of amendment with the North Carolina Secretary of State effectively to change its corporate name to "Myers Bigel, P.A."

4.      Prior to February 11, 2016, MB was duly incorporated as "Myers Bigel Sibley & Sajovec, P.A." On or about February 11, 2016, MB filed articles of amendment with the North Carolina Secretary of State effectively to change its corporate name to "Myers Bigel & Sibley, P.A." All references to "MB" herein shall be deemed automatically to reference simultaneously all predecessor corporate names.

5.      On information and belief, Lynne A. Borchers ("Borchers") is a citizen and resident of Wake County, North Carolina and served as MB's managing shareholder and vice president from around January 1, 2016 to January 3, 2017.

6.      Other currently unnamed persons may include other individuals, who are not presently known to Lemon at this time to the requisite degree of certainty or understanding, but who were instrumental in causing, influencing or condoning the Section 1981 violations, as alleged herein.

7.      At all times relevant herein, MB has been engaged in an industry affecting commerce with fifteen or more employees of each working day in each of

2

twenty or more calendar weeks in the current or preceding calendar year for both

the current date and the date of separation, as alleged herein.

8.      At all times relevant herein, all referenced shareholders, directors,

managers and attorneys of MB were acting within the scope of their employment

during the actions alleged and MB has authorized or ratified the actions of MB's

shareholders, directors, managers, and attorneys, as alleged herein.

9.      At all relevant times, MB's acts, omissions, and business practices, as

alleged herein, took place in Wake County, North Carolina.

ADMINISTRATIVE REMEDIES:

10.     On March 7, 2017, within 180 days after having been subjected to the

discriminatory employment practices, as alleged herein, Lemon filed a charge of

discrimination with the United States Equal Employment Opportunity Commission

("EEOC") concerning Lemon's claim of having been subjected to disparate treatment

because of her race as an African-American and gender as a female and in

retaliation for having opposed sex discrimination and a hostile work environment

because of gender, as alleged herein. A true copy of the above-referenced charge of

discrimination is attached hereto as Exhibit A and is incorporated herein by

reference.

11.     On January 25, 2018, the EEOC issued Lemon a notice of right to sue

regarding the above-referenced charge of discrimination. A true copy of the

referenced notice of right to sue is attached hereto as Exhibit B and is incorporated

herein by reference.

3

12.     Within 90 days after having first received the referenced notice of right to sue, Lemon filed this action in the North Carolina Superior Court, pursuant to 42 U.S.C. § 2000e-5.

<u>GENERAL ALLEGATIONS:</u>

*Background*

13.     From August 24, 2001 to this current date, Lemon has been an attorney duly licensed to practice law by the North Carolina State Bar. In addition to having earned a J.D., Lemon has also earned a Ph.D in Biomedical Sciences/Pharmacology. At all times relevant herein, Lemon's law practice has been focused in the area of patent law.

14.     From around September 2001 to December 31, 2016 ("tenure"), Lemon was employed by MB to serve as one of its patent lawyers.  Throughout the tenure of Lemon's employment, MB:

      a.     could hire or fire Lemon at any time with or without cause;

      b.     would set the rules and regulations pertaining to Lemon's work and professional relationship with the firm;

      c.     would review Lemon's work to ensure that assignments were met satisfactorily and would provide Lemon with feedback regarding the same under its quality control procedures;

      d.     would require Lemon to report to someone with higher authority within the organization of MB;

4

e.     intended Lemon to be an employee as evidenced by the content contained in written employment and shareholder agreements; and by admissions from other shareholders; and

f.     would issue Lemon a Form W-2 for each tax year for purposes of reporting her gross income to the United States Internal Revenue Service.

15.     At all times during her tenure of employment, Lemon met or exceeded all reasonable work expectations of her employer, MB, and generally excelled in the performance of her job duties.

16.     At no time during her tenure did Lemon ever receive any disciplinary sanction, counseling, warning or complaint. As a general practice, Lemon treated all supervisors, colleagues, and subordinates in a professional manner with fairness, respect, and good will.

*Lemon Reports Gender Discrimination*

17.     On information and belief, MB hired attorney Kevin S. Joyner ("Joyner") of the Ogletree Deakins law firm at some point prior to June 2, 2016 to investigate and advise it concerning claims of gender discrimination, including a hostile work environment that were asserted by three of MB's female attorneys/employees (collectively "complainants").

18.     As part of his investigation, Joyner met with Lemon on or about June 2, 2016 to determine her personal knowledge about gender discrimination in MB's workplace.

5

19.     During the course of the interview, which lasted at least one hour, Lemon candidly reported her personal knowledge to Joyner about facts that ultimately supported the complainants' concerns about gender discrimination in MB's culture and workplace environment.

20.     During the course of the interview, Joyner informed Lemon that he did not represent Lemon regarding her sincere concerns about gender discrimination in the workplace.

21.     On information and belief, Joyner used the substantive information provided to him by Lemon regarding gender discrimination in the workplace in part to prepare a "confidential memorandum" for MB's board of directors to review.

22.     On or about June 14, 2016, Joyner provided MB's board of directors with a copy of the "confidential memorandum" that included information that Lemon had provided to him and that confirmed or corroborated gender discrimination existing in MB's work environment.

23.     Prior to MB's circulation of the "confidential memorandum," Lemon had requested to review it beforehand to ensure accuracy of the content attributed to her, but Borchers refused Lemon's request. However, on information and belief, Borchers did provide a copy of the "confidential memorandum" to other attorney-shareholders who were not on the management committee prior to its circulation to members of MB's board of directors.

6

24. On or about June 15, 2016, MB had a board of directors meeting to review and discuss Joyner's "confidential memorandum" among MB's board members.

*Immediate Retaliation for Having Reported Gender Discrimination*

25. During MB's board meeting of June 15, 2016, board members openly excoriated Lemon after reviewing the confidential memorandum in at least the following ways:

     a.     board member, Scott Hatfield, openly referred to Lemon's statements concerning the hostile work environment as "idiotic;"

     b.     shortly after Hatfield referred to Lemon's statements as "idiotic," Joyner informed the board members that Hatfield's characterization of Lemon's concerns was "not accurate;"

     c.     another board member responded openly to Joyner's statement that he would have said "much worse [than Hatfield]" in describing his reaction to Lemon's statements concerning the hostile work environment;

     d.     other board members literally screamed at Lemon to "grow up" and "stop complaining;" and

     e.     other board members chastised Lemon for having hired a lawyer to advise her during the course of Joyner's interview of her.

26. On information and belief, these hostile and derogatory comments regarding Lemon's concerns were made openly by board members to Lemon during the board meeting on June 15, 2016, but without any reproach or reprimand by MB.

27.     Following the June 15, 2016 board meeting, MB's shareholder Julie Richardson told another shareholder that Lemon "played the black card too much." However, at that point in time, Lemon had never made any complaints to MB about "race" or being "black."

28.     Richardson's purposefully derogatory comment about Lemon was based exclusively on her own unfair and inaccurate racial stereotypes about African-Americans being persons who knowingly voice false concerns about racism in the workplace in an effort to gain some material advantage.

29.     On information and belief, Richardson sought to spread the inaccurate and ugly stereotype about African-Americans as being applicable to Lemon in an effort to discredit and isolate Lemon from collegiality and support in the workplace in retaliation for having reported gender discrimination to Joyner.

30.     On July 8, 2016, an MB shareholder and management committee member prepared and circulated an email to MB's shareholder/employees that referenced Lemon as a "bad asshole" for having expressed undisputed "sincere concerns" about gender discrimination to Joyner. The email stated that MB needed more "good assholes" instead.

31.     On July 13, 2016, MB's board of directors unilaterally expelled one of the complainants as a member of MB's management committee in retaliation for having complained about the hostile work environment, as was reported in Joyner's "confidential memorandum."

8

32. Also during the board meeting of July 13, 2016, a non-shareholder attorney, Mitchell Bigel, openly reprimanded Lemon for her having expressed sincere concerns about gender discrimination. Bigel openly directed Lemon to "leave [the firm] and do better."

*MB Discriminated and Retaliated Against Lemon by Rejecting STL Participation*

33. On or about September 14, 2016, Lemon elected to participate in MB's short-term leave/short-term disability ("STL") plan as a qualified applicant under the firm's policies and procedures.

34. In addition to qualifying to participate in MB's STL plan through her own health condition at the time, Lemon further qualified for participation due to two additional independent qualifying events that were being experienced by Lemon's immediate family members.

35. Prior to Lemon's election, MB's management committee would ministerially confirm an attorney/employee's STL request and simply inform the board of directors about the attorney/employee's election to participate in the STL plan.

36. However, instead of approving Lemon's election at the typical ministerial management committee level, MB subjected Lemon to insensitive questioning about her health at the management committee level and required her to obtain medical documentation for further consideration.

37. Although Lemon obtained the requested medical documentation from her physician that confirmed the need for accommodations through the STL plan and

offered to provide the same to MB's director of administration, MB informed Lemon that she instead would need to address MB's board of directors with her request to participate in the STL plan, notwithstanding her having unquestionable, multiple qualifying events.

38.     MB placed the issue of Lemon's STL request on the agenda for the October 19, 2016 meeting of MB's board of directors.

39.     By placing Lemon's STL request on the board's agenda, MB facilitated the open discussion among board members about Lemon's private health condition, which was an underlying basis for the leave request.

40.     During the board meeting of October 19, 2016, MB directed Lemon and one of the female complainants to leave the meeting so that the board may discuss the matter in their absences.

41.     On information and belief, the other complainant had not made any election to participate in the STL plan that year, but was directed to leave the board meeting because MB had planned to discuss discriminatory and retaliatory acts concerning the complainant and Lemon.

42.     After a brief discussion about Lemon's STL election, the board took a vote of whether to grant or deny the STL election by Lemon. On information and belief, all but three of the approximate twenty board members voted to deny Lemon's election to invoke the right to participate in the STL plan even though she was otherwise qualified under MB's policies.

10

43. On information and belief, MB's board of directors had never previously voted on this issue of STL election as it pertained to its Caucasian employees, including those seeking short-term leave for such events as cataract surgery, undisclosed illnesses, and even for one employee who did not otherwise qualify for the STL plan, but was granted participation by MB nonetheless.

44. On information and belief, prior to Lemon's request for STL plan participation, MB had never required any other shareholders or employees to disclose their specific medical conditions to prove qualification; never required other shareholders or employees to present their request for STL plan participation to the board of directors for approval; and never required the shareholder or employee to present physician statements confirming health conditions.

45. Following the rejection of Lemon's election to participate in MB's STL plan, the managing shareholder, Borchers, discussed "punishment" for "bad behavior" and specifically mentioned Lemon's name along with that of another complainant for having "hired a lawyer" back in June 2016 to discuss the sincere concerns each had about MB's gender discrimination and its hostile work environment towards female attorneys and employees.

46. During the board meeting of October 19, 2016, Borchers also suggested and discussed a range of punishment for Lemon with MB's board of directors, including public censure, monetary penalties, and termination.

47. During the board meeting of October 19, 2016, shareholder D. Randal Ayers moved to change MB's compensation plan for the retaliatory purpose to

11

detrimentally affect Lemon's compensation, which contravened the firm's history of not changing a compensation plan in a negative manner when there is a subject specifically affected by the change.

48.     On information and belief, MB's purpose for denying Lemon's valid and qualified request for STL leave was to cause Lemon to experience financial and emotional costs that would serve, in effect, as "punishment" in significant part for having participated and assisted the complainants during the course of MB's "investigation" through Kevin Joyner.

49.     On October 7, 2016, a day following Lemon's request for STL, but prior to the board's consideration of the request, MB's management committee circulated notes of its meetings held weeks prior. These notes, dated August 2, 2016, contained a substantially higher level of detail on information and belief than notes previously provided to MB's shareholders.

50.     The notes purportedly covered a conversation that Lemon had with MB's shareholder and management committee member, Alice Bonnen ("Bonnen"), but the content included inaccurate statements attributed to Lemon and contained a critical omission by Bonnen.

51.     The inclusion of such statement negated the purpose of the notes which were disseminated to persuade the board of directors that Lemon's conduct showed that there is unresolved conflict and that from a business standpoint the management committee should consider action to resolve Lemon's alleged undermining of the firm.

52.     In reality, Lemon's actual comments to Bonnen instead showed that Lemon had no intent to undermine the firm. This notwithstanding, Bonnen and other members of the management committee knowingly retained the misleading information in the notes to deceive MB's shareholders for purposes of discrediting and retaliating against Lemon.

53.     The notes further highlight the disparate treatment of the complainants that continued after Joyner's "investigation" where a male shareholder's interaction with a staff member involving the male shareholder yelling and cursing at a female staff member resulting in her fear of the male shareholder was described as his merely addressing the female staff member "loudly and angrily." No mention of his previous similar interaction with a different female staff member was made and no statements regarding remedial measures to be taken regarding his unacceptable behavior or any indication that his conduct was at odds with acceptable workplace behavior were expressed in the management committee notes.

54.     On or about November 2, 2016, Lemon became aware that MB's management committee had openly discussed racial and gender discrimination and its retaliatory actions against Lemon and the complainants during at least one of its meetings.

55.     Lemon also became aware that MB's management committee had specifically discussed terminating her as part of the retaliation and that another shareholder had specifically discussed a motion to terminate Lemon's employment.

56.     Around November 4, 2016, a poorly noticed meeting was called for the shareholders of MB's ChemBio practice group of which Lemon was a member. During this meeting, MB's shareholder/employees interrogated Lemon by asking about her "intentions" and whether she was going to sue the firm.

57.     MB's ChemBio practice group further openly chastised Lemon on or about November 4, 2016 for having hired a lawyer to address her sincere concerns regarding MB's hostile work environment towards women.

58.     In a veiled threat, one shareholder/employee, Bonnen, ominously asked Lemon at the November 4, 2016 ChemBio practice group meeting what would happen "if somebody pushed" her "off the cliff."

59.     Around this period, Lemon was repeatedly asked to speak with MB's board of directors to answer "some tough questions." On November 5, 2016, MB's managing shareholder, Borchers, emailed Lemon to inform that Lemon was being placed on the agenda for the board of directors meeting scheduled for November 8, 2016 based on a meeting with ChemBio members regarding "workplace concerns" with no further specification.

60.     Lemon subsequently provided MB's management committee with documentation from a health care provider that indicated she needed to avoid stress during this time for health reasons. MB's hostile work environment had been taking a toll on Lemon's health by causing her to experience difficulty in breathing through the exacerbation of her asthmatic condition.

61.     On December 23, 2016, Lemon tendered her resignation because she could no longer work under the extraordinary stress, humiliation and hostile work environment that she had been experiencing within MB's workplace, as alleged herein.

<u>FIRST CLAIM FOR RELIEF</u>:
(Section 1981—Disparate Treatment)

62.     The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

63.     On information and belief, when Lemon submitted her STL request to MB on or about September 14, 2016, Lemon was qualified to participate in MB's STL plan under the terms and conditions set forth in MB's policies, procedures, and customary practices applicable at the time.

64.     On information and belief, prior to Lemon's election to participate in the firm's STL plan, MB had white or Caucasian shareholder employees (collectively "prior applicants") who had likewise requested to participate in the firm's STL plan.

65.     On information and belief, MB ministerially confirmed the requests of the prior white or Caucasian applicants at the management committee level, including at least one prior applicant who was not qualified to participate under the applicable policies, without the requirement to provide medical documentation, present to board of directors, and/or submit to a vote by the board of directors.

66.     On information and belief, for its white or Caucasian employees, MB ministerially confirmed their STL requests at the management committee level.

15

67. MB denied Lemon the option to have her STL request confirmed at the management committee level in a ministerial manner. Instead MB required that Lemon obtain and provide medical documentation, present her request to the board of directors, and submit for a vote after full disclosures about her health condition so that her request could be rejected for discriminatory reasons under guiding influence of Borchers.

68. Moreover, on information and belief, MB had never before changed the compensation plan to adversely affect a Caucasian shareholder employee at the time of the change as it did to Lemon.

69. On information and belief, Borchers was instrumental in influencing other board members to treat Lemon differently because of race, as alleged herein.

70. On information and belief, MB and Borchers denied Lemon the ability to elect or otherwise participate in the STL plan because she was African-American even though she was otherwise qualified.

71. In violation of 42 U.S.C. § 1981, MB and Borchers denied Lemon the right to make and enforce her contract with MB and to have the full and equal benefit of all laws when MB and Borchers intentionally discriminated against Lemon because of her race by rejecting her request to participate in MB's STL plan even though she was fully qualified for the same.

72. As a direct and proximate result of MB's and Borchers' acts of discrimination against Lemon, as alleged herein, Lemon has incurred damages in an amount to be determined at trial, but in excess of $25,000.

73. On information and belief, MB and Borchers engaged in discriminatory practices against Lemon, as alleged herein, with malice or with reckless indifference to the federally protected rights of Lemon as an aggrieved individual.

<u>SECOND CLAIM FOR RELIEF</u>:
(Title VII-Race Discrimination)

74. The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

75. On information and belief, MB wrongfully and intentionally discriminated against Lemon because of her race as an African-American in violation of *Title VII of the Civil Rights Act of 1964*, as amended and codified in 42 U.S.C. § 2000e, *et seq.* in at least the following ways:

    a. Even though Lemon was qualified to invoke the STL plan, MB denied her election to participate in the STL plan because of Lemon's race as an African-American and gender as a female or otherwise used her race and gender as a motivating factor in denying her election to participate;

    b. Notwithstanding Lemon's complaints, MB not only failed to promptly and effectively remediate its hostile work environment towards Lemon in retaliation for her having reported illicit discrimination, MB through its managers encouraged or continued with the ongoing harassment and retaliation against her.

76. Even if MB did not have the specific discriminatory animus to discriminate or retaliate against Lemon, which is denied, MB's adverse actions were caused or influenced by MB's partners, members, principals, shareholders, managers and/or employees who were motivated by a discriminatory animus

17

because of her race and gender that were intended to cause, and in fact, did cause, MB's adverse actions and retaliation against Lemon.

77. As a direct and proximate result of MB's acts of discrimination against Lemon on the basis of race, as alleged herein, Lemon has incurred damages in an amount to be determined at trial, but in excess of $25,000.

<u>THIRD CLAIM FOR RELIEF</u>:
(Title VII-Retaliation)

78. The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

79. Lemon engaged in activity protected under Title VII, 42 U.S.C. § 2000e-3, *et seq.*, in June 2016 when Lemon reported in good faith her personal knowledge and understanding to Joyner about gender discrimination, including a hostile work environment towards female attorneys/employees, in MB's workplace in June 2016.

80. Because of Lemon having engaged in the protected activity, as alleged above, MB through its managers intentionally caused Lemon to experience and suffer through the materially adverse employment actions that were individually and collectively meant to punish her for, and dissuade her from, engaging in protected activity.

81. Specifically, the materially adverse employment actions that MB caused Lemon to be subjected to, or knowingly failed to prevent or otherwise protect her from, the following actions:

18

a. permitting Lemon to be subjected to continuous, frequent and scorn, humiliation and ridicule by other attorneys and employees in the demeaning open remarks and statements made to Lemon and to others about Lemon for having reported gender discrimination, as alleged herein;

b. denying Lemon the opportunity to participate in MB's STL plan even though she was otherwise qualified;

c. requiring that Lemon's STL request be considered by the board of directors instead of by the management committee so that Lemon could be humiliated and unnecessarily embarrassed by the open discussion of her request, including very private references about her health condition to all the board members with whom she worked;

82. As a direct and proximate result of MB's acts of retaliation against Lemon, as alleged herein, Lemon has suffered harms, losses, and damages in an amount to be determined at trial, but in excess of $25,000.

## DEMAND FOR JURY TRIAL:

Pursuant to N. C. R. Civ. P. 38 and 42 U.S.C. § 1981(a)(c), Lemon hereby makes demand for a trial by jury for all triable issues.

## PRAYER FOR RELIEF:

WHEREFORE, Lemon prays unto the Court as follows:

1. That Lemon receive judgment against Defendants jointly and severally in an amount to be determined at trial, but in excess of $25,000 for all applicable compensatory damages for pecuniary and non-pecuniary harms and losses,

including without limitation, that for emotional pain, suffering, mental anguish, loss of enjoyment of life, damage to reputation, and any other applicable damages under 42 U.S.C. § 1981, *et seq.* and common law;

2.      That Lemon receive punitive damages against Defendants jointly and severally, pursuant to 42 U.S.C. § 1981a(b)(1);

3.      That Lemon recover from Defendants jointly and severally all pre-judgment and post-judgment interest and court costs, including without limitation expert witness fees, deposition costs, and attorneys' fees, as permitted by law;

4.      That Lemon receive a jury trial as to all matters so triable; and

5.      That the Court grant Lemon such other and further relief as the Court deems just and proper.

This the 4th day of April, 2018.

BAILEY & DIXON, LLP

By: _____

J. Heydt Philbeck
434 Fayetteville Street, Suite 2500
Raleigh, North Carolina 27601
Telephone: (919) 828-0731
Email: hphilbeck@bdixon.com

*Attorneys for Plaintiff Lemon*



**Nationwide®**
is on your side

# Certification

I, Jimmie Knighten-Brey as a duly authorized Nationwide associate entrusted with oversight of the system of record from which this copy was produced, based upon information and belief, certify under the penalty of perjury that this attached copy of **ACP BAF 2274430067, JDR OF NC INC** was made at or near the time of certification, as part of regularly conducted business activities, and is a true and accurate copy of the official record kept as part of regular business activities.

DocuSigned by:

*Jimmie Knighten-Brey*

4AC7E144188E458...

4/4/2018

Signature                           Date

Jimmie Knighten-Brey

Print Name

CL Processing Supervisor

Title

EXHIBIT
A
tabbies®

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 433-2017-00778 |

and EEOC

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Shawna Cannon Lemon | (919) 678-1101 | 08/07/1968 |

| Street Address | City, State and ZIP Code |
|---|---|
| 301 Keybridge Drive, Morrisville, NC 27560 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (incl. Area Code) |
|---|---|---|
| Myers Bigel, PA | 15-100 | (919) 854-1400 |

| Street Address | City, State and ZIP Code |
|---|---|
| 4140 Parklake Avenue, Suite 600, Raleigh, NC 27612 | |

| Name | No. Employees, Members | Phone No. (incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN

☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION

☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 10-19-2016   Latest 12-31-2016

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):
The particulars are contained in the attached Exhibit A, which is incorporated herein by reference.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the above is true and correct.

2/28/17
Date

_Charging Party Signature_

NOTARY – When necessary for State or Local Agency Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.
SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(month, day, year)

## EXHIBIT A

The particulars of my charge of discrimination and retaliation are as follows:

I.     I am a black female of African-American descent. From September 2001 to December 31, 2016 ("tenure"), I was employed full-time by Myers Bigel, P.A. (formerly "Myers Bigel & Sibley, P.A." and "Myers Bigel Sibley & Sajovec, P.A.,") (collectively "Respondent") as a duly licensed attorney who practiced in the area of patent law. In addition to a *juris doctor,* I have also earned a Ph.D. in Biomedical Sciences/Pharmacology. I had signed an employment agreement with Respondent. Each year, Respondent issued me IRS W-2 forms to report my income. Respondent was run by the board of directors, which in turn accepted recommendations from a managing committee.

II.     At all times during the tenure of my employment, I met or exceeded all reasonable expectations of my employer and excelled in the performance of my job duties. During this tenure, I had never been subjected to any disciplinary actions. As a general practice, I treated all supervisors, colleagues, and subordinates in a professional manner with fairness, respect and good will.

III.     On or about June 2, 2016, I met with Respondent's lawyer, Kevin Joyner ("Joyner"), to discuss the sex discrimination, including the hostile work environment that I had been experiencing while working for Respondent. Respondent had hired Joyner to investigate and advise it as to complaints of sex discrimination it had received from three of its lawyer-employees (collectively "EEO complainants"). On June 14, 2016, Joyner reported to Respondent's board of directors in a "confidential memorandum" the information that I had provided him that confirmed Respondent's hostile work environment. During a board of directors' meeting on June 15, 2016, Respondent's board member, Scott Hatfield, openly referred to my allegations about the hostile work environment as "idiotic." Another board member responded that he would have said "much worse [than Hatfield]" in describing his reaction to my complaint. A third board member chimed in that the female complainants (including myself) needed to just "grow up" and stop complaining.

IV.     In his memorandum of June 14, 2016, Joyner stated, "Shawna characterizes her complaint as one of a 'hostile work environment' though not necessarily based on discrimination. Yet, she does not believe that she would have been treated the same way were she a male." Although the memorandum specifically (and erroneously) states that I did not characterize my complaint as being necessarily based on discrimination and fails to indicate racial discrimination, after the June 15, 2016 board meeting, Respondent's shareholder Julie Richardson told another shareholder that I play the "black card" too much, notwithstanding the fact that at that point, I had never made any complaints to Respondent about "race" or my being "black."

Richardson's comment was instead based exclusively on her own inaccurate stereotype about African-Americans who may have concerns about their workplace.

V.    On July 13, 2016, Respondent's board of directors expelled one of the EEO complainants, Elizabeth Stanek, as a member of the management committee in retaliation for having complained about the hostile work environment, as referenced in Joyner's confidential memorandum. In my meeting with Joyner, I had substantiated Stanek's complaints about a hostile work environment because of sex/gender in the workplace.

VI.    On or about September 14, 2016, I had elected to participate in the short-term leave ("STL"), pursuant to Respondent's policies and procedures. In the past, Respondent's management committee would inform the board of directors of the employee's election to participate in the STL plan. However, Respondent refused my election to participate in the STL plan at the management-committee level. Instead, Respondent placed the issue for discussion and vote during the board of director's meeting scheduled for October 19, 2016. During this meeting, I was asked to leave along with Elizabeth Stanek, one of the other EEO complainants. All but five (including myself and Stanek) of the approximate twenty board members voted to deny my election to invoke the right to participate in the STL plan even though I was otherwise qualified. On information and belief, the board of directors had never previously voted on this issue as it pertained to its other employees, including those seeking STL for cataract surgery, death of a niece, severe back pain, and an undisclosed illness.

VII.    Following this rejection of my election to participate in the STL plan, the managing shareholder, Lynne Borchers discussed "punishment" for the "bad actors," where she specifically mentioned my name and that of EEO complainant, Stanek, for "hiring a lawyer" back in June 2016 to discuss the hostile work environment. Borchers suggested a range of punishment to the board of directors, including public censure, removal as a director, monetary penalties, and/or termination. On information and belief, the purpose of denying my valid request for STL leave was to cause me to experience financial costs that in effect would serve as a "fine" for having participated and assisted the EEO complainants during the investigation.

VIII.    On October 7, 2016, Respondent's management committee circulated notes of its meetings held months prior. These notes dated August 2, 2016 contained a substantially higher level of detail than notes previously provided to Respondent's shareholders. The notes further covered a conversation that I had with Respondent's shareholder and management committee member Alice Bonnen ("Bonnen"), but were inaccurate and contained a critical omission. The inclusion of such statement negates the purpose of the notes which were disseminated to persuade the board of directors that my conduct showed that there is unresolved conflict and that from a

business standpoint the management committee should consider action to resolve this undermining of the firm. My actual comments to Bonnen instead showed that I did not have any intent to undermine the firm. The notes further highlight the disparate treatment of the EEO complainants where a male shareholder's interaction with a staff member involving the male shareholder yelling and cursing at a female staff member was described as his addressing the female staff member "loudly and angrily." No mention of his previous similar interaction with a female staff member was made and no statements regarding remedial measures to be taken regarding his unacceptable behavior were expressed in the management committee notes.

IX.     On or about November 2, 2016, I became aware that Respondent's management committee had discussed racial discrimination and its retaliatory actions against me and the EEO complainants.  I also became aware that the management committee had specifically discussed terminating me and that another shareholder had specifically discussed a motion to terminate my employment.

X.     Around November 4, 2016, a meeting was called for the shareholders of Respondent's ChemBio practice group of which I was a member.  During this meeting, Respondent's shareholder/employees asked about my "intentions" and inquired whether I was going to sue the firm.  One shareholder/employee, Bonnen, asked me what would happen "if somebody pushed" me "off the cliff."  Around this period, I was repeatedly asked to speak with the board of directors to answer "some difficult questions."  On November 5, 2016, Respondent's manager Borchers emailed me to inform that she was placing me on the agenda for the November 8, 2016 board of directors meeting based on a meeting with ChemBio members regarding workplace concerns, but specified no further. I subsequently provided the management committee with a doctor's note that indicated I needed to avoid stress during this time for health reasons. The hostile work environment was taking a toll on my health by causing me to experience difficulty in breathing through the exacerbation of my asthmatic condition.

XI.     On December 23, 2016, I tendered my resignation because I could no longer accept the hostile work environment that I had been experiencing within Respondent's workplace.

XII.     On information and belief, Respondent wrongfully and intentionally discriminated against me because of my gender as a female and race and color as an African-American and retaliated against me for having engaged in protected activity in violation of *Title VII of the Civil Rights Act of 1964*, as amended and codified in 42 U.S.C. § 2000e, *et seq.* in at least the following ways:

A.     Even though I was qualified to invoke the STL plan, Respondent denied my election for STL because of my gender and/or race and in retaliation for having engaged in

Protected activity by reporting discriminatory and retaliatory acts to Respondent's EEO investigator, Kevin Joyner.

      B.    Notwithstanding my complaints, Respondent not only failed to promptly and effectively remediate its hostile work environment towards me in retaliation for having reported illicit discrimination, Respondent encouraged continued retaliation and encouraged a continued hostile work environment against me along with the other EEO complainants.

      XIII.    On information and belief, even if Respondent did not have the specific discriminatory animus to terminate me and/or retaliate against me, which is denied, Respondent's adverse actions were caused or influenced by Respondent's partners, members, principals, shareholders, managers and/or employees who were motivated by a discriminatory animus because of my race and gender that were intended to cause, and did in fact cause, Respondent's adverse actions and retaliation against me.

      IX.    I incorporate by reference the intake questionnaire that I filed with the EEOC on January 10, 2017.

2/28/17
Date

Shawna Cannon Lemon

EEOC Form 161-B (11/16)

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)



To:  Shawna C. Lemon
     301 Keybridge Drive
     Morrisville, NC 27560

From:  Raleigh Area Office
       434 Fayetteville Street, Suite 700
       Raleigh, NC 27601

☐  On behalf of person(s) aggrieved whose identity is
   CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 433-2017-00778 | Generosa J. Tabor, Investigator | (919) 856-4088 |

(See also the additional information enclosed with this form.)

NOTICE TO THE PERSON AGGRIEVED:

Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA): This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[X]  More than 180 days have passed since the filing of this charge.

☐  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐  The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_signature_   1-25-18

Enclosures(s)

Thomas M. Colclough,
Deputy Director

(Date Mailed)

cc:  Kevin Joyner
     OGLETREE DEAKINS
     4208 Six Forks Road
     Suite 1100
     Raleigh, NC 27609

J. Heydt Philbeck
BAILEY & DIXON
434 Fayetteville Street
Suite 2500
Raleigh, NC 27601