| | | |
|---|---|---|
| SHAWNA CANNON LEMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | PLAINTIFF'S MEMORANDUM OF |
| | ) | LAW IN OPPOSITION TO |
| MYERS BIGEL, P.A., formerly known | ) | DEFENDANTS' MOTION |
| as "Myers Bigel & Sibley" and "Myers | ) | TO DISMISS |
| Bigel Sibley & Sajovec, P.A., LYNNE | ) | |
| A. BORCHERS, and UNNAMED | ) | |
| OTHERS, | ) | |
| | ) | |
| Defendants | ) | |

Pursuant to Local Civil Rules 7.1(e) and 7.2, plaintiff Shawna Cannon Lemon

("Lemon"), by and through undersigned counsel, hereby respectfully submits this

memorandum of law in opposition to defendants' motion to dismiss in this action.

## NATURE OF THE CASE:

On April 4, 2016, Lemon filed this civil action against defendants Myers

Bigel, P.A. (individually "MB" and collectively "Defendants") and Lynne A. Borchers

(individually "Borchers" and collectively "Defendants") in the Wake County

Superior Court. In her complaint, Lemon asserted discrimination and retaliation

claims against Defendants for violations of 42 U.S.C. § 2000e-1, *et seq.* and 42

U.S.C. § 1981. Defendants were served with process on April 9, 2016 (Borchers) and

April 12, 2016 (MB). On May 9, 2016, Defendants filed a notice of removal of this

action to the United States District Court for the Eastern District of North

Carolina. After filing several consent motions to extend time, which were granted by the Court, Defendants filed the pending motion to dismiss Lemon's claims, pursuant to Fed. R. Civ. P. 12(b)(6). For reasons stated herein, Lemon opposes Defendants' motion to dismiss.

## ISSUES PRESENTED:

I.      Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against individuals because of their gender and retaliating against individuals because of their cooperation in investigations for discrimination. Title VII permits shareholders to sue a qualified corporate "employer" so long as the shareholder is a "person aggrieved" under the statute. Did Lemon state claims against the corporate "employer" under Title VII even though she was a shareholder?

II.     Section 1981 provides individuals with the right to the performance and enjoyment of all benefits from contractual relationships without regard for race. Under the *Swierkiewicz* and *Iqbal* standards, did Lemon state a plausible Section 1981 claim for race discrimination when Defendants denied her the benefit of short-term leave for which she was qualified under the standards Defendants applied when approving short-term leave for persons of a race other than Lemon's race.

## STATEMENT OF THE FACTS:[1]

Shawna Lemon is an attorney licensed by the North Carolina State Bar. (¶ 13) She is a black female of African-American descent. (¶ 1) In addition to a law degree, Lemon has also earned a Ph.D. in biomedical sciences/pharmacology. (¶ 13) In September 2001, MB hired Lemon to serve as one of its patent lawyers. (¶ 14) Lemon worked as a patent attorney for MB until December 31, 2016. (¶14) Lemon generally

---

[1] All paragraph citations contained in this section reference the corresponding paragraphs in Lemon's complaint in this action.

excelled in the performance of her job duties at MB. (¶15) At no time throughout her tenure did she ever receive any disciplinary actions. (¶16) As a general practice, Lemon treated all supervisors, colleagues, and subordinates in a professional manner with fairness, respect, and good will. (¶ 16)

During the Spring 2016, several female attorneys/employees at MB asserted complaints about gender discrimination, including a hostile work environment because of gender. (¶ 17) MB hired attorney Kevin S. Joyner ("Joyner") of the Ogletree Deakins law firm to investigate and advise it concerning these claims of gender discrimination. (¶ 17) As part of the investigation, Joyner met with Lemon on June 2, 2016 to determine her personal knowledge about the gender discrimination in MB's workplace. (¶ 18) Joyner made clear to Lemon that he did not represent her regarding her sincere concerns about gender discrimination in MB's workplace. (¶20)

During the course of the interview, Lemon candidly reported her personal knowledge about gender discrimination in MB's culture and workplace environment. (¶19) Using the substantive information gathered from the investigation, including that provided by Lemon, Joyner prepared a "confidential memorandum" that confirmed or corroborated the existence of gender discrimination in MB's work environment. (¶ 22) Around June 14, 2016, Joyner provided MB's board of directors with a copy of the "confidential memorandum" that included the information provided to him by Lemon and other female attorneys, which confirmed or corroborated the existence of gender discrimination in MB's workplace. (¶22)

On June 15, 2016, MB's board of directors met to review and discuss Joyner's "confidential memorandum" among MB's board members. (¶24) During this meeting, MB's board members openly excoriated Lemon after reviewing the confidential memorandum. (¶25) One board member openly referred to Lemon's hostile workplace concerns as being "idiotic" while another board member added that he would have said "much worse" in response to the other board member's *ad hominem* attack. (¶ 25) Other board members literally screamed at Lemon to "grow up" and "stop complaining" while others chastised Lemon for having hired a lawyer to advise her during the course of Joyner's interview. (¶ 25) These derisive comments to and about Lemon were made openly during the board meeting without any reproach or reprimand by MB. (¶ 25)

Following the board meeting, one MB shareholder told another that Lemon "played the black card too much." (¶ 27) This board member's reference was based on her own unfair and inaccurate racial stereotype about African-Americans being persons who knowingly voice false concerns about racism in the workplace in an effort to gain some material advantage. (¶ 28) Even though Lemon had not previously complained to MB about "race" or being "black," the shareholder used it as an effort to discredit and isolate Lemon from collegiality and support in the workplace in retaliation for having reported gender discrimination to Joyner. (¶¶ 27, 29)

Shortly thereafter on July 8, 2016, a MB shareholder and management committee member prepared and circulated an email to MB's shareholder/employees that referenced Lemon as a "bad asshole" for having expressed undisputed "sincere

concerns" about gender discrimination to Joyner. (¶ 30) The email stated that MB needed more "good assholes" instead. (*Id.*) On July 13, 2016, MB's board of directors unilaterally expelled a female member of MB's management committee in retaliation for having complained about MB's hostile work environment towards women, as was reported in Joyner's "confidential memorandum." (¶31) Also during this board meeting, a non-shareholder attorney openly reprimanded Lemon for her having expressed sincere concerns about gender discrimination at MB. (¶32) At the board meeting, he openly directed Lemon to "leave [the firm] and do better." (*Id.*)

Around September 14, 2016, Lemon elected to participate in MB's short-term leave/short-term disability ("STL") plan as a qualified applicant under the firm's policies and procedures. (¶ 33) In addition to qualifying to participate through her own health condition at the time, Lemon additionally qualified to participate due to two additional independent qualifying events that were experienced by Lemon's immediate family members. (¶34) Prior to Lemon's election, MB's management committee would ministerially confirm an attorney/employee's STL request and simply inform MB's board of directors about the attorney/employee's election to participate in the STL plan. However, instead of approving her election at the typical ministerial management committee level, MB subjected Lemon to insensitive questioning about her health at the management committee level and required her to obtain and present additional medical documentation. (¶36)

Lemon obtained the requested additional medical documentation from her physician confirming the need for accommodations through the STL plan. (¶ 37)

When Lemon offered to provide this information in emails to MB's director of administration, MB informed Lemon that she instead would need to address MB's board of directors about her request to participate in the STL plan, notwithstanding her having unquestionable, multiple qualifying events. (*Id.*) MB placed the issue of Lemon's STL request on its board of director's agenda for the October 19, 2016 meeting. (¶38) By placing Lemon's STL request on the board's agenda, MB facilitated an open discussion among MB's board members about Lemon's private health condition, which was an underlying basis for the leave request. (¶39) Prior to the board meeting of October 19, MB's management committee circulated modified notes of its previous meetings that falsely attributed comments to Lemon showing unresolved conflict and that the management committee should consider adverse action against Lemon for "undermining" the firm. (¶¶ 49-53) The purpose was to discredit Lemon and force a denial of her request for STL leave. (*Id.*)

During the board of director's meeting of October 19, 2016, MB directed Lemon and one of the female discrimination complainants (who incidentally was not making an STL election) to leave the meeting so that the board of directors could discuss the issue in their absences. (¶¶ 40-41) The board of directors expelled Lemon and the other female member (who had previously complained about the hostile work environment) so that the members could more freely discuss discriminatory and retaliatory acts concerning Lemon and the other female member who had previously complained. (*Id.*)

After a brief discussion about Lemon's STL election, MB's board of directors voted to deny the STL election by Lemon even though she was qualified to participate under MB's policies. (¶ 42) Prior to this meeting, MB's board of directors had never previously required its Caucasian attorneys/shareholders to disclose specific medical conditions to prove qualification, never required any other attorneys/shareholders to present physician statements confirming health conditions, and never required attorneys/shareholders to present their request for STL plan participation to the board of directors for approval. (¶¶ 43-44)

Immediately following the board of directors' rejection of Lemon's STL election, MB's managing shareholder, Borchers, discussed "punishment" for "bad behavior" and specifically mentioned Lemon's name along with that of another female attorney who had complained about gender discrimination in MB's workplace for having "hired a lawyer" back in June 2016 to discuss the sincere concerns each had about MB's hostile work environment towards female attorneys and employees. (¶ 45) Borchers then proceeded to discuss a range of punishment for Lemon with MB's board of directors, including the prospect of censure, monetary penalties, and termination. (¶46) The board of directors under Borchers' direction further discussed changing MB's compensation plan (and thus Lemon's compensation) for the retaliatory purpose of detrimentally affecting Lemon's compensation. (¶47) In fact, MB's purpose in denying Lemon's valid and qualified request for STL leave was to retaliate against her by causing financial and emotional costs that would serve in significant part as

"punishment" for having participated and assisted in standing against gender discrimination in her disclosures to Joyner. (¶ 48)

Around November 2, 2016, Lemon became aware that MB's management committee had openly discussed racial and gender discrimination and its retaliatory actions against Lemon (and the EEO complainants) during at least one of its meetings. (¶54) Specifically, Lemon learned that MB's management committee had discussed terminating her as part of the retaliation and discussed a motion to terminate Lemon's employment. (¶ 55) During a practice group meeting on November 4, 2016, MB's shareholders interrogated Lemon by asking about her "intentions" and whether she was going to sue the firm. (¶56) MB's shareholders further openly chastised Lemon during the meeting for having hired a lawyer to address her sincere concerns about MB's hostile work environment towards women. (¶57) In a (perhaps no so) veiled threat, one shareholder ominously asked Lemon at the practice group meeting what would happen "if somebody pushed [her] off the cliff?" (¶58)

On November 5, 2016, MB's managing shareholder, Borchers, emailed Lemon to inform that Lemon was being placed "on the agenda" for the board of directors meeting scheduled for a few days later because of the referenced practice group meeting and "workplace concerns" without further specification. (¶59) Lemon subsequently provided MB's management committee with documentation from a health care provider that indicated she needed to avoid stress during this time for health reasons. (¶ 60) MB's hostile work environment had caused Lemon to

experience *inter alia* difficulty in breathing through the exacerbation of her asthmatic condition. (*Id.*)

On December 23, 2016, Lemon tendered her resignation to MB because she could no longer work under the extraordinary stress, humiliation and hostile work environment that she had been experiencing in MB's workplace. (¶ 61)

## ARGUMENT:

## I. Standard for review.

"To survive a motion to dismiss under Fed. R. Civ. P 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 570). "In other words, the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims 'across the line from conceivable to plausible.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 256 (4th Cir. 2009)(citing *Iqbal*, 556 U.S. at 683). A plaintiff is not required to plead facts that constitute a prima facie case to survive a motion to dismiss. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510-11 (2002); *McCleary-Evans v Md. DOT,* 780 F.3d 582, 584 (4th Cir. 2015). Fed. R. Civ. P. 8(a)(2) "requires only a short and plain statement of the claim showing the pleader is entitled to relief . . ." *Twombly,* 550 U.S. at 555. Specific facts are not necessary; the statement need only

"give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 93 (2007).

To state a claim under Title VII, plaintiff is required only to allege facts to satisfy the elements of a cause of action created by that statute—i.e. . . . the [defendant] "fail[ed] or refus[ed] to hire" her "because of [her]race . . . [or] sex." *McCleary-Evans,* 780 F.3d at 591. The court must determine whether it is plausible that the factual allegations in the complaint are enough to raise a right to relief above the speculative level. *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 757 (4th Cir. 2011).

Employment discrimination claims carry no heightened pleading standard. *See Twombly,* 550 U.S. at 569-70.In considering a motion to dismiss made under Rule 12(b)(6), "[the] court accepts all well-pled  facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." *Erickson,* 551 U.S. at 93-94; *Nemet Chevrolet, Ltd.,* 591 F.3d at 255. The court draws all reasonable inferences in favor of the plaintiff. *Id.* This standard, applied to the applicable law discussed below, dooms Defendants' motion.

## II. Defendant's motion to dismiss Lemon's sex discrimination and retaliation claims under Fed. R. Civ. P. 12(b)(6) should be denied because Lemon alleged sufficient facts plausibly showing she was an "individual" and "person aggrieved" within the meaning of Title VII.

Defendants argue that Lemon's Title VII claims "must be dismissed" because Title VII only applies to "employee/employer" relationships and that Lemon had not adequately alleged that she was an "employee" of defendant MB. (DB p. 1) Notably,

Defendants do not challenge the notion that when construing the facts to be true, Lemon alleged sufficient facts showing it plausible that defendant MB discriminated against Lemon because of her gender and retaliated against her for engaging in activity protected under law. Accordingly, acknowledging sufficient facts showing defendant MB plausibly discriminated against Lemon because of her gender and retaliated against her for engaging in protected activity, the sole question for the Court as to this issue is whether Lemon was protected from sex discrimination and retaliation as an "individual" and "person aggrieved" under Title VII even if she was a concurrent employee and shareholder for defendant MB.

### A. Title VII should be liberally construed in light of its remedial purpose.

The purpose of Title VII of the Civil Rights Act is to eliminate discrimination in employment based on race, color, religion, sex, or national origin. *Griggs v. Duke Power Co.,* 401 U.S. 424, 429 (1969). "Congress clearly included in the objectives of Title VII the elimination of job discrimination in professional fields including law and medicine." *See Lucido v. Cravath, Swaine & Moore,* 425 F. Supp. 123, 126 (S.D.N.Y. 1977). The courts have accorded a liberal interpretation to Title VII to effectuate this Congressional purpose. *Butler v. Drive Auto. Indus. Of Am.,* 793 F.3d 404, 409-10 (4th Cir. 2015)("Title VII should be liberally construed in light of its remedial purpose"); *see also Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir. 1971),*cert. denied,* 406 U.S. 957 (1972)("Congress intended that Title VII proscribe employment discrimination 'in the broadest possible terms' and, accordingly, it 'should be accorded a liberal interpretation . . . to effectuate the purpose of Congress to

11

eliminate the inconvenience, unfairness and humiliation of [employment] discrimination").

The Fourth Circuit has recently demonstrated the judicial trend to interpret Title VII terms in an expansive measure to achieve its purposes. In *Butler,* the Fourth Circuit determined whether "joint employers" could be liable to employees as an "employer" under Title VII. *Butler,* 793 F.3d at 409-10. After recognizing the remedial purpose behind Title VII, the Fourth Circuit held that an expansive scope of interpretation for the statutory definition of "employer" was in accordance with its Congressional purpose. *Id.; see also Magnuson v. Peak Tech. Servs.,* 808 F.Supp. 500, 508 (E.D.Va. 1992)("the term 'employer' under Title VII should be 'construed in a functional sense to encompass persons who are not employers in conventional terms, but who nevertheless control some aspect of an individual's compensation, terms, conditions, or privileges of employment'").

**B.  By its plain language, Title VII broadly protects "individuals" within workplace from sex discrimination and retaliation by an "employer" (defined as that with 15 or more employees) and enables "persons aggrieved" with a private right to action.**

Title VII declares it an unlawful employment practice for an *employer* (*i.e.* defined as entities with 15 or more employees) to ". . . discriminate against any *individual* with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . ." 42 U.S.C. § 2000e-2(a)(Emphasis added). The term "employer" is specifically defined in relevant part as a "person engaged in an industry affecting commerce who has fifteen or more employees . . ." 42 U.S.C. § 2000e(b). In this case, Defendants do not dispute that

12

defendant MB met the definition of the term "employer" under Title VII by having fifteen or more employees during the statutorily relevant times, as defined by statute. 42 U.S.C. § 2000e(b). The question Defendants raise is whether Lemon, as a shareholder, had standing to sue defendant MB under Title VII even though MB is undoubtedly an "employer" within the scope of the statute.

Congress specifically chose the expansive term "individual," rather than the more limited term of "employee" in the description of the proscribed actions by employers, as contained in 42 U.S.C. § 2000e-2(a) and § 2000e-3(a); *Kennedy v. St. Joseph's Ministries, Inc.,* 657 F.3d 189, 192 (4th Cir. 2011)("as in all statutory construction, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning").

The Act defines "employee" as "an individual employed by an employer." 42 U.S.C. § 2000e(f). However, in providing the right to file private civil actions in district court, Congress specifically omitted using the term "employee," but instead chose the substantially more expansive term "person aggrieved" as for standing to file suit under Title VII. 42 U.S.C. § 2000e-5(f)(1); *see also Sibley Mem'l Hosp. v. Wilson,* 488 F.2d 1338, 1341 (D.C. Cir. 1973)("The Act defines 'employee' as 'an individual employed by an employer,' but nowhere are there words of limitation that restrict references in the Act to 'any individual' to include only former employees or applicants for employment, in addition to present employees"). Moreover, as for retaliation, Congress *explicitly* included "any individual" (in addition to "employees") for protection, thus, indicating an intent for broad

applicability well beyond that of a mere "employee" in the workplace. *See* 42 U.S.C. § 2000e-3(a).

The central question is whether Lemon was a "person aggrieved" within the meaning of Title VII and, therefore, has standing to bring the claims for gender discrimination and retaliation against defendant MB. Consistent with the expansive purpose of Title VII in eradicating discrimination, Congress defined the term "person" to include *individuals* in addition to corporate entities and governmental agencies. 42 U.S.C. § 2000e(a). If Congress intended to exclude from its definition of "person" to exclude individuals who are shareholders, it would have specifically said so--- or at least narrowed the purposeful wide-scope of the terms "individuals" and "person aggrieved," simply by substituting the statutory language with the term "employee."

Put differently, by Title VII's plain language, Congress specifically intended an expansive scope for individuals, such as Lemon, to have the protections from illicit discrimination and retaliation by employers as it pertains to their compensation, terms, conditions or privileges of employment, and provided those *individuals*, so aggrieved, with standing to assert protections under Title VII. 42 U.S.C. §§ 2000e-2 and 2000e-5; *see Kennedy v. St. Joseph's Ministries, Inc.,* 657 F.3d 189, 191 (4th Cir. 2011)("If the statute is unambiguous, 'our inquiry into Congress' intent is at an end, for if the language is plain and the statutory scheme is coherent and consistent, we need not inquire further").

It follows that defendant MB--- which entity indisputably qualified as an "employer" under Title VII by having fifteen or more employees--- had a legal duty not to discriminate against *individuals* because of their sex in the terms and conditions of employment, or otherwise, risks facing a Title VII action from any *person aggrieved. See* 42 U.S.C. §§ 2000e(b).[2] If Congress intended to limit standing under Title VII only to "employees," it would have simply used the term "employees," instead of using the terms "individuals" and "persons aggrieved." Alternatively, Congress could have altered the definition of the term "employer," but instead chose to limit it only by the minimum number of individuals necessary to qualify as an "employer." As such, by its plain language, Lemon has standing under Title VII to assert her sex discrimination and retaliation claims against MB for its unlawful business practices within the workplace.

C. **Even under the *Clackamas* standard, which applies to determining the threshold number of "employees" sufficient to satisfy the qualification for "employer," Lemon alleged sufficient facts plausibly showing she has standing to assert claims for sex discrimination and retaliation under Title VII.**

Defendants argue the applicability of the Supreme Court's holding in *Clackamas* as for who has standing to file a civil action under Title VII. *See Clackamas Gastroenterology Assoc. P.C. v. Wells,* 538 U.S. 440 (2003). In *Clackamas,* the plaintiff filed suit against the defendant, pursuant to the *Americans*

---

[2] Note that in their brief, Defendants only reference the unlawful employment practices pertaining to *employees* in subsection 2 of 42 U.S.C. § 2000e-2. Defendants completely omit the applicable subsection 1, which directly references "or otherwise discriminate against any *individual* . . . ." *See* DB p. 6; c.f. 42 U.S.C. § 2000e-2(a) and (b)(Emphasis added). Defendants' selective citation of the law in its brief to this Court does not fairly state its applicability as it pertains to this action.

*with Disabilities Act of 1990* ("ADA"). *See* 42 U.S.C. §§ 12101, *et seq.*[3] The

*Clackamas* plaintiff was a bookkeeper for defendant corporation and, undoubtedly,

an "employee" for ADA purposes with standing in which to assert a disability

discrimination claim. *Clackamas,* 538 U.S. at 442. Instead, the Court was called to

determine whether the defendant corporation was covered under the ADA because

(unlike the case at bar) it did not have the statutory requisite of 15 or more

employees. *Id.* The Court had to determine who counted as "employees" for purposes

of determining "15 or more employee" threshold to confer statutory jurisdiction. The

central issue in *Clackamas* was a completely different issue that is presented in the

case at bar where there is no dispute that defendant MB had the requisite number

of employees to count as an "employer" under Title VII.

However, assuming *arguendo* that the *Clackamas* holding applies for

standing to assert protection from Title VII, Lemon has asserted sufficient facts

plausibly showing her to be an "employee" under Title VII under this standard. In

*Clackamas,* the issue was whether four physician-shareholders who owned the

professional corporation and constituted its board of directors should be counted as

"employees" in the determination as whether the professional corporation had the

requisite 15 employees for statute applicability. *Id.* In its decision, the Court held

six factors to be considered in determining whether an individual "acts

---

[3] The ADA provides a specialized, unique definition for both a "qualified individual," "covered entity," and "employer." 42 U.S.C. § 12111(2), (5) and (8). Any "person" can bring a claim "in violation of any provision" of the ADA. 42 U.S.C. § 12117(a). However, what constitutes a violation is limited in relevant part by 42 U.S.C. § 12112(a)("No *covered entity* shall discriminate against a *qualified individual* on the basis of disability in regard to . . . terms, conditions, and privileges of employment")(Emphasis added).

independently and participates in managing the organization" (hence an "employer" and not counted in the 15 or more person threshold) or whether the "individual is subject to the organization's control" (hence an "employee" subject to the 15 or more person threshold). *Id.* at 449. The critical factor is whether an individual exhibits a level of "control" over an entity such that she should be considered as an "employer" rather than an "employee."

The Court found the following six factors, drawn from EEOC's Compliance Manual, as relevant to the inquiry whether a shareholder-director in a particular work situation is an "employer" or an "employee" for purposes of counting the 15 employee minimum threshold:

> Whether the organization can hire or fire the individual or set rules and regulations of the individual's work;
>
> Whether and, if so, to what extent the organization supervises the individual's work;
>
> Whether the individual reports to someone higher in the organization;
>
> Whether and, if so, to what extent the individual is able to influence the organization;
>
> Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts;
>
> Whether the individual shares in the profits, losses, and liabilities of the organization.

*Id.* at 449-50. The Court held that "the answer to whether a shareholder-director is an "employee" to determine whether the threshold was met depended on 'all of the incidents of the relationship . . . with no one factor being decisive.'" *Id.* at 450-51; *see also Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 32

(1961)("There is nothing inherently inconsistent between the coexistence of a proprietary and an employment relationship). After establishing the standard for what constituted an "employee" in determining whether an entity is an "employer" with potential ADA liability, the Court ultimately remanded the case to the district court for further findings. *Id.*

In her complaint, Lemon alleged sufficient facts showing a plausible conclusion that she met the *Clackamas* standard for "employee" to the extent applicable. Lemon was employed by defendant MB to serve as one of its patent lawyers. (Compl. ¶ 14) Defendant MB could "hire or fire Lemon at any time with or without cause." (Comp. ¶¶14(a), 55) This fact is further supported by the fact that Lemon "met or exceeded all reasonable work expectations . . . and generally excelled in the performance of her job duties."[4] (Compl. ¶ 16) A "non-shareholder attorney" openly reprimanded Lemon for her having expressed sincere concerns about gender discrimination and further directed her to "leave [the firm] and do better."[5] (Compl. ¶ 32) MB's managing shareholder openly discussed "punishment" for "bad behavior" that she had attributed to Lemon for having "hired a lawyer." (Compl. ¶ 45) There was an open discussion by MB's board of directors about a "range of punishment" for Lemon, including the potential for "public censure, monetary penalties, and *termination.*" (Compl. ¶ 46)(Emphasis added) A plan to terminate Lemon was

---

[4] The reasonable implication being that if Lemon did not meet the reasonable expectations of her employer, that she would have been terminated for performance reasons rather than discrimination or retaliation.

[5] *i.e.* conduct by an "of counsel" attorney wholly inconsistent if the target of his criticism, Lemon, were one with "power" or "control" of MB.

openly discussed by MB's management committee and another shareholder had specifically discussed a motion to terminate Lemon's employment. (Compl. ¶55) MB called Lemon to appear before the board of directors to answer "some tough questions." (Compl. ¶59)

In his investigation concerning MB's hostile work environment, MB's lawyer informed Lemon prior to interviewing her that he did "not represent" Lemon, but that he represented MB.[6] (Compl. 20) MB's managing shareholder, Borchers, refused to provide Lemon with a copy of the "confidential memorandum" prepared by MB's legal counsel that she provided to other shareholders prior to its circulation to members of the board of directors.[7] (Compl. ¶23)) In Lemon's invocation for participation in the STL plan, defendant MB required her to be subjected to a vote by the managing committee and board of directors unlike others with true power and control. (Compl. ¶¶ 33-48) Inconsistent with being anything other than an "employee," defendant MB directed Lemon to leave the board meeting because it had planned to discuss the discriminatory and retaliatory acts, at issue, about Lemon. (Compl. ¶41) Further indicative of Lemon's lack of power or control, MB's board of directors further excluded Lemon from the "privileged information" regarding her STL request. (Compl. ¶¶ 41-42)

---

[6] The reasonable implication being if MB's lawyer represented MB and Lemon were a true owner with control and influence, there would be at the very least be a potential conflict-of-interest in the representation.

[7] If she were a true "owner" with power and control, Lemon would have an absolute legal right to review the "confidential memorandum" just as others with power and control of MB. However, the reasonable implication by Borchers' action, or inaction, underscore her understanding that Lemon had no such power or control.

Moreover, defendant MB would set the rules and regulations pertaining to Lemon's work and professional relationship with the firm. (Compl. ¶¶ 14(b), 50) Defendant MB reviewed Lemon's work to ensure that assignments were met satisfactorily and provided Lemon with feedback regarding the same under its quality control procedures. (Compl. ¶14(c)) Defendant MB required Lemon to report to someone with higher authority within the corporate organization. (Compl. ¶¶ 14(d), 59) Further, defendant MB intended that Lemon be an employee as evidenced by the written employment agreements and shareholder agreements and by admissions from other shareholders. (Compl. ¶ 14(e)) For each tax year, defendant MB would issue Lemon a Form W-2 for purposes of reporting her gross income to the Internal Revenue Service.[8] (Compl. 14(f))

Defendants argue that the "Employment Agreement . . . expressly states the "employment" ends when the individual becomes a Shareholder" and cites its Exhibit A, ¶ 3 as the source. (DB p. 8) However, a close reading of the "Employment Agreement" cited by Defendants reveal their assertion to be a misrepresentation through misapprehension of the cited content. Paragraph 3 of the "Employment Agreement" reads: "This Agreement shall be terminated by the EMPLOYEE at any time upon thirty (30) days' written notice which written notice shall be considered to be given upon the offer of any stock in the EMPLOYER, *by the EMPLOYEE,* to the EMPLOYER." (DB, Ex. A, ¶ 3)(Emphasis added)

---

[8] Form W-2 (officially, "Wage and Tax Statement") is an Internal Revenue Service form used to report wages paid by employers to employees along with the taxes withhold from them. *See generally* 26 U.S.C. § 6051, 26 C.F.R. §§ 31.6051-1 and 31.6051-2.

While Defendants contend that this provision "expressly states" that the employment ended "when the individual becomes a Shareholder," a close reading indicates quite the opposite: that written notice that the "Employment Agreement" is terminated shall be automatically considered *upon the Employee offering to give up Employer's stock to the Employer.*[9] *Id.* By its own terms, the Employment Agreement indicates that Lemon as an "employee" will still be able to own stock at some point in the future without necessarily losing her "employee" status, which, as Defendants' exhibit shows, is precisely what had happened. Contrary to Defendants' contentions in their brief, the documents submitted by Defendants, as referenced in the complaint by Lemon, actually underscore Lemon's allegations about being an "employee" of defendant MB, notwithstanding the fact of owning some shares.

There is simply nothing that Defendants can point to that would indicate that Lemon at any time exerted control or had the right to exert control or even shared control over the MB organization. Lemon had no control over her fate, as the control-group within MB were exhibiting. She could not cause the cessation of the extraordinary stress, humiliation, and hostile work environment that the control-group within MB inflicted on her, so she tendered her resignation rather than be faced with termination by the control-group or continue suffering from the resulting mental duress. (Compl. ¶¶ 60-61) If Lemon had "control" or the right to exert "control" within MB, she would have most certainly caused the hostile work

---

[9] Defendants' mischaracterization lies in the fact that the "triggering event" is the *employee* offering to give up her [already issued] stock to the "Employer," not whenever stock is issued, if at all.

environment and retaliation towards her to cease. Unfortunately, as demonstrated in the complaint, Lemon had no such control.

As the Third Circuit has observed, "the *Clackamas* test is a fact intensive one; therefore, cases requiring application of the test may generally require resolution at the summary judgment stage, rather than at the motion to dismiss stage. *Mariotti v. Mariotti Bldg. Prods.,* 714 F.3d 761, 768 n.5 (3d Cir. 2013). Lemon respectfully requests that the Court issue an order denying Defendants' motion to dismiss her claims under Title VII, pursuant to Fed. R. Civ. P. 12(b)(6).

### III. DEFENDANTS' MOTION TO DISMISS LEMON'S § 1981 CLAIM SHOULD BE DENIED UNDER FED. R. CIV. P. 12(b)(6) BECAUSE LEMON ALLEGED SUFFICIENT FACTS ESTABLISHING A PLAUSIBLE CLAIM FOR RACE DISCRIMINATION.

Defendants argue that Lemon's § 1981 claim "also must be dismissed" because she purportedly failed to allege sufficient facts showing it plausible that Defendants discriminated against Lemon because of her race in denying her invocation of the STL plan. (DB p. 1)

Section 1981 affords a federal remedy against discrimination in private employment *inter alia* on the basis of race. *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975). The statute provides that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This right extends, for example, to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.*; § 1981(b).

22

The elements required to establish a *prima facie* case are the same under Title VII and Section 1981. *James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 375 n.1 (4th Cir. 2004). To establish a *prima facie* case of discriminatory denial of an employment benefit, a plaintiff must show that: (1) the plaintiff is a member of a protected class; (2) the defendant provided a certain benefit to its employees; (3) the plaintiff was eligible for the benefit; and (4) the plaintiff was not provided the benefit under circumstances giving rise to an inference of discrimination. *Thompson v. Potomac Elec. Power Co.,* 312 F.3d 645, 649-50 (4th Cir. 2002); *c.f. Swierkiewicz,* 534 U.S. at 510-11(A plaintiff is not required to plead facts that constitute a prima facie case to survive a motion to dismiss);[10] *McCleary-Evans*, 780 F.3d at 584(same).

In determining whether Lemon's claims contain factual allegations that raise the right to relief above the speculative level, there is no dispute that plaintiff alleged she was a member of a protected class. (Compl. ¶1) As admitted by Defendants in their brief, there is also no dispute that defendant MB provided a STL plan as a benefit to its shareholders, including Lemon. (Compl. ¶¶ 33-34)(DB pp. 10, Ex. B, pp. 140-61; Ex. D)

Instead, Defendants raise issues as to whether Lemon was eligible to participate in the STL plan and whether she was not provided the benefit of the

---

[10] "When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims . . . Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case." *Swierkiewicz,* 534 U.S. at 511-12.

STL plan under circumstances giving rise to an inference of discrimination. Lemon alleged that she qualified to participate in MB's STL plan through not only her own health condition, but also further qualified to participate from two additional independent qualifying events that were being experienced by her immediate family members. (Compl. ¶¶ 34-37) Defendants' evidence actually corroborates these two independent qualifying conditions: prolonged illness suffered by the Shareholder for which leave is recommended by a physician and prolonged serious illness of an immediate family member that imposes a substantial burden on the Shareholder and impairs the ability of the Shareholder to meet the 1600 billable hour requirement. (DB Ex. D, p. 3) Lemon alleged that she provided MB with the appropriate medical documentation supporting her application for STL participation. (Compl. ¶ 37) By their actions, or rather inactions, Defendants tacitly concede these qualifications; of all the voluminous documents that Defendants provided to the Court, as attached to their brief, Defendants tactically chose to omit attaching Lemon's request that she submitted showing her qualifications (in addition to the explicit allegations contained in the complaint). (DB Ex A-D)

Moreover, Lemon alleged that MB's practice as for what constituted "qualifications" was ministerial in practice and that the management committee would merely "inform" the board of directors about the attorney/employee's election to participate in the STL plan. (Compl. ¶¶ 35-36) Lemon further alleged that in the past MB had never required other shareholders or employees to disclose their specific medical conditions or otherwise prove qualification for the STL plan.

(Compl. ¶ 44) Lemon undoubtedly alleged facts showing that she was plausibly qualified to participate in MB's STL plan, particularly in light of MB's practice to grant "qualification" for some shareholders, other than Lemon, in a ministerial manner, even for conditions not covered by its own plan. (Compl. ¶ 43)

Lemon also alleged sufficient facts showing Defendants denied her the benefit of participating in the STL plan under circumstances giving rise to an inference of discrimination. Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. *Id.* at 267. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. *Id.* Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached. *Id.* The administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. *Id.* at 268.

In their brief, Defendants seek for the Court to see this question essentially in a vacuum. Defendants do not explain the totality of the circumstances in their brief as for the allegations made by Lemon. Defendants completely ignore the pertinent facts related to Lemon's initial experience with a hostile work

environment and retaliation arising from her cooperating in an investigation about discrimination. (*See* Compl. ¶¶ 13-32) It is important to consider the context, background, and firm culture for overt retaliation as for the investigation concerning a hostile work environment because of sex and retaliation related thereof, particularly when it involves the same set of persons. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008)(whether evidence of discrimination by other supervisors is relevant in an individual discrimination case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case). Evidence of a discriminatory and retaliatory work culture is highly relevant to the question as to whether race was a motivating factor underlying a firm's decision to deny a benefit contrary to its past standards and practices. Just four months before a board vote was taken to deny Lemon the STL plan benefit, board member Julie Richardson told another shareholder that Lemon "played the black card too much" even though the statement was not based on any underlying fact. (Compl. ¶¶ 27-28) Lemon alleged on information and belief that Richardson continued to spread the inaccurate and ugly stereotype of Lemon "playing the black card too much" in an effort to discredit and isolate Lemon from collegiality and support, which discovery could reveal lasted up to the board vote to deny STL benefit four months later. (Compl. ¶ 29)

Against this discriminatory and retaliatory backdrop, Lemon requested the firm's STL benefit as a qualified applicant. (Compl. ¶ 33) Lemon alleged that prior to her election, MB would "ministerially confirm an attorney/employee's STL

request and simply inform the board of directors about the attorney's election to participate in the STL plan. (Compl. ¶ 35) However, MB treated Lemon differently—MB subjected Lemon to insensitive questioning about her health and required medical documents (which it did not require for others). (Compl. ¶ 36) Once Lemon obtained the requested medical documentation (that MB did not require for others), MB informed Lemon that she would instead be required to address MB's board of directors with the request. (Compl. ¶ 37) Of the hundreds of pages of documents that Defendants attached to their brief, they omitted including any minutes of other STL decisions showing other attorneys had been required to present their health conditions, etc. to the board of directors in an effort to secure approval for STL decisions. (DB Ex A-D)

After openly discussing Lemon's health conditions, MB's board of directors denied her invocation of STL leave. (Compl. ¶¶ 39, 42) Among the voluminous documents Defendants attached to their brief, Defendants omitted inclusion of any board minutes that would indicate at least a putative legitimate business reason for denying Lemon's request for STL leave. (DB Ex A-D) Lemon further alleged that MB directed that Lemon and another board member (who had been a complainant of sex discrimination) to leave the board meeting "so that the board may discuss the matter in their absences." (Compl. ¶ 40) Lemon and the other board member had a legal right to be in attendance at the board meeting. The fact that Defendants excluded them from the board meeting where a discussion of the true reasons would take place further give rise to an inference of discrimination.

Lemon specifically alleged that MB's board of directors had never previously voted on the issue of STL election as it pertained to its Caucasian attorneys, including those seeking short-term leave for such events as cataract surgery, undisclosed illnesses (thus indicating no reason need be provided), and for one who would not qualify for the STL plan under policy, but was nonetheless permitted to participate. (Compl. ¶ 43) Lemon also alleged facts showing MB's attempts to re-write their past notices of meetings in an effort to help it in the event of legal action. (Compl. ¶¶ 49-52)

Defendant Borchers played a significant role behind the denial by MB's board of directors for Lemon to participate in the STL plan for which she was qualified. (Compl. ¶¶ 45-46) Lemon became aware on November 2, 2016 that MB's management committee (of which Borchers was a member) had openly discussed racial discrimination *inter alia* and its retaliatory actions against Lemon during at least one of its meetings. (Compl. ¶ 54) *Richard v. Bell Atl. Corp.*, 946 F. Supp. 54, 74 (D.D.C. 1996)(Individuals may be liable under Section 1981 when they have been "personally involved in the discrimination" and have "directly participated" in the alleged discriminatory acts.")

On November 5, 2016, Borchers emailed Lemon to appear at another board of directors meeting on November 8, 2016 to discuss "workplace concerns" with no elaboration. (Compl. ¶ 59) Lemon provided MB's management committee with a doctors' note to excuse her from having to appear before the board of directors for health reasons related to the accompanying stress. (Compl. ¶ 60) Lemon resigned

from her employment shortly thereafter. (Compl. ¶ 61) When reviewed in their totality, Lemon alleged sufficient facts giving arise to an inference of race discrimination for MB's denial of her request for participation in MB's STL plan.

In their brief, Defendants asserted essentially that Lemon had not alleged damages. Compensatory damages may be inferred from the circumstances as well as proven by the testimony. *Ferrill v. Parker Group, Inc.,* 168 F.3d 468 (11th Cir. 1999). The standard of review for awards of compensatory damages for intangible, emotional harms is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses. Defendants' assertions concerning the harm, losses and damages incurred by Lemon by Defendants' actions are contained in the complaint. (Compl. ¶¶ 37, 60-61, and 72)

As such, Lemon alleged facts showing a plausible claim for racial discrimination under Section 1981. The Court should deny Defendants' motion to dismiss for purported failure to state a claim under Fed. R. Civ. P. 12(b)(6).

## CONCLUSION:

For the reasons set forth herein, Lemon respectfully requests that the Court deny Defendants' motion to dismiss her claims in this action and that Lemon have the opportunity to make her case following discovery in this action.

This the 10th day of September, 2018.

BAILEY & DIXON, LLP

By: */s/ J. Heydt Philbeck*
J. Heydt Philbeck
434 Fayetteville Street, Suite 2500
Raleigh, North Carolina 27601
Telephone: (919) 828-0731
Facsimile: (919) 828-6592
Email: hphilbeck@bdixon.com
NC State Bar # 19379

*Attorneys for Plaintiff*

CERTIFICATE OF WORD COUNT:

Pursuant to Local Civil Rule 7.2(f)(4), I hereby certify that the foregoing document complies with the type-volume limitations of Local Civil Rule 7.2(f) and contains 7,647 words (8400 word limit), excluding those portions exempted by the rule.

This the 10th day of September, 2018.

*/s/ J. Heydt Philbeck*
J. Heydt Philbeck
Bailey & Dixon, LLP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-cv-200

| | | |
|---|---|---|
| SHAWNA CANNON LEMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CERTIFICATE OF SERVICE |
| | ) | |
| MYERS BIGEL, P.A., *et al.,* | ) | |
| | ) | |
| Defendants | ) | |

The undersigned counsel hereby certifies that on this date, a copy of the foregoing PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS was electronically filed with the Clerk of Court for the EDNC using the CM/ECF system, which should send notification of such filing to the counsel for the parties listed below, who are believed to be CM/ECF participants.

This the 10th day of September, 2018.

BAILEY & DIXON, LLP

By:   */s/ J. Heydt Philbeck*
      J. Heydt Philbeck
      434 Fayetteville Street, Suite 2500
      Raleigh, North Carolina 27601
      Telephone: (919) 828-0731
      Email: hphilbeck@bdixon.com

SERVED ON:
Kerry A. Shad, Esq.
Smith, Anderson, Blount, *et al.*
Post Office Box 2611
Raleigh, NC 27602-2611
Email: kshad@smithlaw.com