UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:18-cv-200-FL

SHAWNA CANNON LEMON,     )
                                 )
        Plaintiff,        )
                                 )
    v.                       )        AMENDED COMPLAINT
                                 )
MYERS BIGEL, P.A., formerly known )
as "Myers Bigel & Sibley, P.A." and   )
"Myers Bigel Sibley & Sajovec, P.A.,"  )
LYNNE A. BORCHERS and       )
UNNAMED OTHERS,          )
                                 )
        Defendants.     )

NOW COMES Plaintiff SHAWNA CANNON LEMON, by and through counsel, and pursuant to Fed. R. Civ. P. 8 and 15, complaining against defendant MYERS BIGEL, P.A. ("MB"), formerly known as "Myers Bigel & Sibley, P.A." and as "Myers Bigel Sibley & Sajovec, P.A." and LYNNE A. BORCHERS ("Borchers"; collectively with MB, "Defendants"), and UNNAMED OTHERS (individually "Others"); Lemon alleges and says as follows:

PARTIES:

1.    At all times relevant herein, Shawna Cannon Lemon ("Lemon") has been a citizen and resident of Wake County, North Carolina. Lemon is a black female of African-American descent.

2.    At all times relevant herein, defendant Myers Bigel, P.A. ("MB") has been a professional association organized and existing under the laws of North

Carolina for the purpose of providing legal services for its clients with its primary place of business in Wake County, North Carolina. As such, MB is empowered to sue and be sued.

3. Prior to December 14, 2016, MB was duly incorporated as "Myers Bigel & Sibley, P.A." On or about December 14, 2016, MB filed articles of amendment with the North Carolina Secretary of State effectively to change its corporate name to "Myers Bigel, P.A."

4. Prior to February 11, 2016, MB was duly incorporated as "Myers Bigel Sibley & Sajovec, P.A." On or about February 11, 2016, MB filed articles of amendment with the North Carolina Secretary of State effectively to change its corporate name to "Myers Bigel & Sibley, P.A." All references to "MB" herein shall be deemed automatically to reference simultaneously all predecessor corporate names.

5. On information and belief, Lynne A. Borchers ("Borchers") is a citizen and resident of Wake County, North Carolina and served as MB's Managing Shareholder and Vice President from around January 1, 2016 to January 3, 2017. As alleged herein, Borchers was a controlling shareholder of MB at all times relevant.

6. Other currently unnamed persons may include other individuals, who are not presently known to Lemon at this time to the requisite degree of certainty or understanding, but who were instrumental in causing, influencing or condoning the unlawful conduct, as alleged herein, and otherwise authorizing and following Borchers as controlling shareholder.

2

7.     At all times relevant herein, MB has been engaged in an industry affecting commerce with fifteen or more employees of each working day in each of twenty or more calendar weeks in the current or preceding calendar year for both the current date and the date of separation, as alleged herein.

8.     At all times relevant herein, all referenced shareholders, directors, managers and attorneys of MB were acting within the scope of their employment during the actions alleged and MB has authorized or ratified the actions of MB's shareholders, directors, managers, and attorneys, as alleged herein.

9.     At all relevant times, MB's acts, omissions, and business practices, as alleged herein, took place in Wake County, North Carolina.

<u>JURISDICTION AND VENUE:</u>

10.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3) because this action is based on Title VII of the *Civil Rights Act of 1964,* 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981.

11.     This Court has supplemental jurisdiction over Lemon's state law claims pursuant to 28 U.S.C. § 1367.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3). MB has its principal office in this District and transacts substantial business here on an ongoing basis. Borchers is a citizen and resident of Wake County, which is within this District. A substantial part of the events or omissions giving rise to Lemon's claims occurred in this District.

<u>ADMINISTRATIVE REMEDIES:</u>

13. On March 7, 2017, within 180 days after having been subjected to the discriminatory employment practices, as alleged herein, Lemon filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC") concerning Lemon's claim of having been subjected to disparate treatment because of her race as an African-American and gender as a female and in retaliation for having opposed sex discrimination and a hostile work environment because of gender, as alleged herein. A true copy of the above-referenced charge of discrimination is attached hereto as Exhibit A and is incorporated herein by reference.

14. On January 25, 2018, the EEOC issued Lemon a notice of right to sue regarding the above-referenced charge of discrimination. A true copy of the referenced notice of right to sue is attached hereto as Exhibit B and is incorporated herein by reference.

15. Within 90 days after having first received the referenced notice of right to sue, Lemon filed this action in the North Carolina Superior Court, pursuant to 42 U.S.C. § 2000e-5.

16. Defendants subsequently removed this action to the United States District Court for the Eastern District of North Carolina, pursuant to 28 U.S.C. § 1446(d).

4

## GENERAL ALLEGATIONS:

### *Lemon's Employment with MB*

17.     From August 24, 2001 to this current date, Lemon has been an attorney duly licensed to practice law by the North Carolina State Bar. In addition to having earned a J.D., Lemon has also earned a Ph.D in Biomedical Sciences/Pharmacology. At all times relevant herein, Lemon's law practice has been focused in the area of patent law.

18.     From around September 2001 to December 31, 2016 ("tenure"), Lemon was employed by MB to serve as one of its patent lawyers.

19.     On or about September 4, 2001, Lemon and MB entered into an Employment Agreement, setting forth the terms and conditions of Lemon's employment.

20.     The Employment Agreement allowed MB to terminate Lemon's employment "without cause and at any time, by giving at least thirty (30) days' written notice . . . ."

21.     The Employment Agreement also set terms and conditions of Lemon's employment with MB, including the following:

> a.     Requiring Lemon "to devote all necessary time and [her] best efforts to the performance of [her] duties as a lawyer for [MB] in accordance with the highest ethical standards of the legal profession and the rules, regulations, and policies of [MB] as adopted from time-to-time";

5

b.    Limiting her ability to work and earn income outside of MB, including income from professional services, teaching fees, director fees, and honorariums;

c.    Requiring her to maintain "professional competence"; and

d.    Requiring her "to observe and comply with the personnel policies, the operating policies and procedures, and all other rules and regulations of [MB]" and "to carry out and perform orders, directions, and policies stated by [MB] to [her.]"

22.    At all times relevant, MB had a strict Quality Control policy. MB required Lemon and MB's other shareholders to comply with the Quality Control policy, by which MB required Lemon and other shareholders to submit their work product for substantive review by another shareholder to ensure that assignments were met satisfactorily and provide Lemon with feedback regarding the same.

23.    The Quality Control policy further required Lemon and MB's other shareholders to submit all draft bills to the Managing Shareholder "for compliance and [to] take appropriate action as necessary."

24.    During 2016, all attorneys at the firm reported to the Management Committee, and to Borchers as Managing Shareholder.

25.    During the tenure of Lemon's employment, MB issued Lemon a Form W-2 for each tax year for purposes of reporting her gross income to the United States Internal Revenue Service.

6

26.     Even after Lemon became a shareholder, Lemon continued to work as an employee of MB, and MB only ever issued Lemon a Form W-2.

27.     Lemon never received a Form K-1 or any other document indicating that she was compensated for her legal services in any capacity other than as an employee. Lemon's compensation was governed at all relevant times by the Attorney Compensation Plan, which was an addendum to the Employment Agreement.

28.     At all times during her tenure of employment, Lemon met or exceeded all reasonable work expectations of her employer, MB, and generally excelled in the performance of her job duties.

29.     At no time during her tenure did Lemon ever receive any disciplinary sanction, counseling, warning or complaint. As a general practice, Lemon treated all supervisors, colleagues, and subordinates in a professional manner with fairness, respect, and good will.

*Lemon's Role in MB's Corporate Governance*

30.     As a professional association, MB is owned by its shareholders.

31.     Although MB is a professional association, in practice it functioned more as a partnership, demonstrated by, among other circumstances alleged herein, the fact that each shareholder holds an equal number of shares of MB and serves as a director and officer of MB.

32.     At all times relevant, MB was governed by a Board of Directors. Each MB shareholder also served as a director of MB, as required by the Bylaws of MB ("Bylaws").

33.     MB conducted its business through regularly-occurring special meetings of the Board of Directors.

34.     Although the Bylaws did not require MB to state the purpose of a special meeting, MB regularly circulated an agenda prior to the meeting stating the purpose for the meeting and outlining the matters to be considered.

35.     The Bylaws expressly reserve the determination of "admission of new member(s) to the Corporation as Shareholder(s), the expulsion of a Shareholder, or the termination of employment of a Shareholder" to MB's Board of Directors.

36.     The Bylaws also provide for the appointment of officers, including President, Managing Shareholder, Vice President, Secretary, Treasurer, Assistant Secretary, and Assistant Treasurer.

37.     Each MB shareholder served as an officer of MB in some capacity. During 2016, Lemon served as Vice President and Secretary; and Borchers served as Managing Shareholder.

38.     While the Bylaws set forth the duties and responsibilities of MB's officers, in practice, at all times relevant, the only officer with any actual authority was Borchers as Managing Shareholder.

39.     On or about January 2, 2007, Lemon entered into the Tenth Modification to Shareholders' Agreement between MB and the twenty (20) shareholders of MB at that time. The Shareholders' Agreement between MB and its shareholders and all subsequent modifications and amendments thereto shall hereinafter be referred to as the "Shareholders' Agreement."

8

40. In executing the Shareholders' Agreement, Lemon agreed to purchase five thousand (5,000) shares for a total of Sixty Two Thousand Two Hundred Forty One Dollars and 17/100 Cents ($62,241.17), and in fact did so.

41. Notably, no provision of the Shareholders' Agreement superseded Lemon's Employment Agreement; rather, the Shareholders' Agreement tied continued ownership of stock to Lemon's continued employment with MB.

42. Despite an amendment to the Shareholders' Agreement in 2009 removing the word "employee" from the Shareholders' Agreement, shareholder status in MB was still inextricably linked to an MB shareholders' continued employment by MB. Upon information and belief, MB would not permit a Shareholder whose employment was terminated to remain as a shareholder of MB.

43. Furthermore, Lemon's Employment Agreement continued in full force and effect after Lemon became a shareholder of MB. Lemon remained subject to MB's control as an employee of MB and continued to be compensated as an employee rather than as a shareholder.

44. During 2016, there were twenty-five (25) shareholders of MB, each owning 5,000 shares of MB stock with equal shareholder rights and voting power.

45. Lemon and Borchers were shareholders of MB during 2016.

*Borchers's Control of MB*

46. MB's Board of Directors also elected a Management Committee, consisting of five (5) shareholders, to "manage" MB and "generally carry out such duties as the Board of Directors may delegate from time to time and carry out

9

generally the legal practice and administrative affairs of [MB]." In practice, most of the Board of Directors' control was delegated to the Management Committee.

47. In 2016, the Management Committee consisted of Borchers, David Beatty, Alice Bonnen, and Rohan Saba, as well as one of the female complainants until her retaliatory removal by the Board of Directors. Borchers was the longest-serving member of the Management Committee at the time.

48. Although MB's bylaws give the Management Committee authority to "carry out such duties as the Board of Directors may delegate," in reality the Management Committee controlled the Board of Directors in at least the following ways:

   a.   The Management Committee scheduled all meetings of the Board of Directors;

   b.   The Management Committee controlled the matters presented to the Board of Directors by preparing and circulating the agenda for such meetings; and

   c.   The Management Committee, through Borchers as Managing Shareholder, made its recommendations regarding corporate actions to the Board of Directors, which were generally followed as a matter of course.

49. Borchers was the leading member of a controlling group of shareholders consisting of David Purks, Scott Hatfield, Tim Wall, David Hall, Peter Siddoway, and Others (the "Controlling Group").

50.     The Controlling Group of shareholders was responsible for a significant portion of MB's revenues and major client relationships, and was followed by the majority of MB's shareholders as a matter of course.

51.     Through their control of MB's revenues and major client relationships, Borchers and the Controlling Group were able to exercise actual control over the Management Committee, the Board of Directors, and MB.

52.     Even though Borchers and the Controlling Group did not hold a numeric majority of MB shares, Borchers and the Controlling Group possessed and exercised actual control of MB and effectively led the majority of shares.

53.     For example, in 2015, Ken Sibley, founder and then-President of MB ("Sibley"), recognized that he was not being permitted to exercise the authority given to him as President under the Bylaws, and raised this issue with the Management Committee.

54.     In 2016, the Management Committee presented this issue to the Board of Directors.

55.     At the direction of Borchers, with the support of the Controlling Group, the Board of Directors decided to consolidate the role of the President with the Managing Shareholder, and otherwise to recognize that Borchers was already occupying both roles in practice.

56.     Upon information and belief, this was done to consolidate the actual control of Borchers and the Controlling Group.

*MB's History of Harassment, Discrimination, and Inequitable Treatment*

57.     Since at least 2011, MB and its shareholders, directors, and officers failed to remediate, and indeed fostered, a workplace that was hostile to women and minorities.

58.     In 2011, while Lemon served on the Management Committee, the Management Committee discussed "the necessity of setting a professional standard of conduct for the work environment that would be applicable to all employees" and a working environment which is "pleasant, healthful, comfortable and free from intimidation, hostility or other offense that might interfere with work performance" and which would not tolerate "harassment of any sort; verbal, physical or visual . . . ."

59.     Although harassment at MB had been an ongoing issue, this discussion was precipitated by a male shareholder commenting to a female shareholder that he would be "so far up [her] ass she wouldn't be able to see straight." Upon information and belief, however, MB took no steps to ensure that the workplace was free from harassment, and instead fostered a workplace where harassment based on race and gender discrimination was tolerated.

60.     Indeed, another instance resulted in one shareholder leaving MB in 2012 due in part to the firm's lack of support for women and families.

61.     Further, on numerous occasions, Lemon witnessed or was told about hiring discrimination against minorities and discrimination against minorities advancing to become shareholders of MB.

12

*Lemon Reports Gender Discrimination*

62. On information and belief, MB hired attorney Kevin S. Joyner ("Joyner") of the Ogletree, Deakins, Nash, Smoak & Stewart, P.C. ("Ogletree Deakins") law firm at some point prior to June 2, 2016 to investigate and advise it concerning ongoing claims of gender discrimination, including a hostile work environment, that were asserted by three of MB's female attorneys/employees (collectively "complainants").

63. As part of his investigation, Joyner met with Lemon on or about June 2, 2016 to determine her personal knowledge about gender discrimination in MB's workplace.

64. During the course of the interview, which lasted at least one hour, Lemon candidly reported her personal knowledge to Joyner about facts that ultimately supported the complainants' concerns about gender discrimination in MB's culture and workplace environment.

65. During the course of the interview, Joyner informed Lemon that he did not represent Lemon regarding her sincere concerns about gender discrimination in the workplace.

66. On information and belief, Joyner used the substantive information provided to him by Lemon regarding gender discrimination in the workplace in part to prepare a "confidential memorandum" for MB's board of directors to review.

67. Lemon requested and was denied an opportunity to review the "confidential memorandum" prepared by Joyner. After Lemon requested and was denied an opportunity to review the "confidential memorandum" prepared by Joyner,

13

Lemon consulted an attorney to assist and advise her in connection with Joyner's investigation.

68. On or about June 14, 2016, Joyner provided MB's Board of Directors with a copy of the "confidential memorandum" that included information that Lemon had provided to him and that confirmed or corroborated gender discrimination existing in MB's work environment.

69. Prior to MB's circulation of the "confidential memorandum," Lemon had requested to review it beforehand to ensure accuracy of the content attributed to her, but Borchers refused Lemon's request. However, on information and belief, Borchers did provide a copy of the "confidential memorandum" to other attorney-shareholders who were not on the Management Committee, including those in the Controlling Group, prior to its circulation to members of MB's Board of Directors.

70. On or about June 15, 2016, MB had a Board of Directors meeting to review and discuss Joyner's "confidential memorandum" among MB's board members.

*Immediate Retaliation for Having Reported Gender Discrimination*

71. During MB's board meeting of June 15, 2016, board members openly excoriated Lemon after reviewing the "confidential memorandum" in at least the following ways:

    a. Hatfield, a member of the Controlling Group, openly referred to Lemon's statements concerning the hostile work environment as "idiotic;"

14

b. Shortly after Hatfield referred to Lemon's statements as "idiotic," Joyner informed the board members during the board meeting that Hatfield's characterization of Lemon's concerns was "not accurate;"

c. Another board member who was a member of the Controlling Group responded openly to Joyner's statement that he would have said "much worse [than Hatfield]" in describing his reaction to Lemon's statements concerning the hostile work environment;

d. Other board members literally screamed at Lemon to "grow up" and "stop complaining;" and

e. Other board members chastised Lemon for having hired a lawyer to advise her after Joyner's interview of her.

72. On information and belief, these hostile and derogatory comments regarding Lemon's concerns were made openly by board members to Lemon during the board meeting on June 15, 2016, but without any reproach or reprimand by MB.

73. These statements reflected the attitude of Borchers, the Controlling Group, and MB.

74. Upon information and belief, after the June 15, 2016 meeting, the Controlling Group held discussions regarding forcing Lemon and another female complainant to leave MB. Specifically, they intended to do so through their actual control of MB, and anticipated taking at least the actions described further herein, motivated by unlawful race and gender discrimination.

75.     Upon information and belief, the Controlling Group and MB began exploring possible retaliatory efforts against Lemon and the other female complainants, including possibly ending the firm's trademark practice, which was led by one of the female complainants. The discussion of ending the firm's trademark practice was made under the pretext of the female complainant's incompetence, but was actually in retaliation to the female complainant's participation in the EEO investigation.

76.     Following the June 15, 2016 board meeting, MB's shareholder Julie Richardson told another shareholder that Lemon "played the black card too much." However, at that point in time, Lemon had never made any complaints to MB about "race" or being "black."

77.     Richardson's purposefully derogatory comment about Lemon was based exclusively on her own unfair and inaccurate racial stereotypes about African-Americans being persons who knowingly voice false concerns about racism in the workplace in an effort to gain some material advantage.

78.     On information and belief, Richardson sought to spread the inaccurate and ugly stereotype about African-Americans as being applicable to Lemon in an effort to discredit and isolate Lemon from collegiality and support in the workplace and amongst the MB Board of Directors and shareholders in retaliation for having reported gender discrimination to Joyner.

79.     On July 8, 2016, David Beatty, an MB shareholder and Management Committee member prepared and circulated an email to MB's shareholder/employees

16

that referenced Lemon as a "bad asshole" for having expressed undisputed "sincere concerns" about gender discrimination to Joyner. The email stated that MB needed more "good assholes" instead.

80.    On July 11, 2016, at the direction of Borchers and the Management Committee, Ashley Woodruff, MB's Director of Administration ("Woodruff"), circulated what purported to be the complete agenda for a Board of Directors meeting scheduled for July 13, 2016; however, the agenda did not include a consideration of removal of one of the female complainants from the Management Committee.

81.    Nevertheless, during the July 13, 2016 Board of Directors meeting, MB's Board of Directors unilaterally expelled one of the complainants as a member of MB's Management Committee in retaliation for having complained about the hostile work environment, as was reported in Joyner's "confidential memorandum."

82.    Also during the board meeting of July 13, 2016, a non-shareholder attorney, Mitchell Bigel, openly reprimanded Lemon for her having expressed sincere concerns about gender discrimination. Bigel openly directed Lemon to "leave [the firm] and do better."

83.    MB held a Board of Directors meeting on July 14, 2016 to discuss the removal of one of the female complainants as a member of the Management Committee.

84.    Prior to the meeting, Sibley noted his disappointment "that a motion of such gravity—which was not on the agenda circulated 7:11 pm Monday evening— was not postponed by the board, so that partners not present (and who had no idea

17

such a motion would be made) would have an opportunity to participate in the discussion and subsequent vote."

85. In June 14, 2016 meeting, Sibley, along with Lemon, moved to cancel the removal of one of the female complainants from the Management Committee. The motion did not carry.

86. Sibley thereafter resigned from Myers, Bigel & Sibley, P.A., a firm he cofounded, on September 14, 2016.

*MB Discriminated and Retaliated Against Lemon by Rejecting STL Participation*

87. As part of MB's policies and procedures, MB adopted a short-term leave/short-term disability ("STL") plan to "provide greater flexibility for Shareholders to work reduced hours due to personal illness, family leave, or serious family illness or other hardship" and to establish a plan for short term leave that is "more equitable than addressing individual situations on an ad hoc basis as they arise."

88. Throughout 2016, Lemon experienced numerous events which qualified her for participation in MB's STL plan.

89. Lemon timely notified Borchers and Woodruff throughout 2016 that she was experiencing qualifying events under the STL plan that made it difficult for her to meet her 1600 billable hour requirement.

90. At no point prior to the invocation of the STL plan did Borchers or Woodruff question the seriousness of these qualifying events or question their legitimacy. Indeed, Borchers and Woodruff followed up with Lemon periodically to

determine whether she was still experiencing the qualifying events and whether she was on track for her work.

91. Eventually, on or about September 14, 2016, Lemon elected to participate in MB's STL plan as a qualified applicant under the firm's policies and procedures.

92. In addition to qualifying to participate in MB's STL plan through her own health condition at the time, Lemon further qualified for participation due to two additional independent qualifying events that were being experienced by Lemon's immediate family members.

93. Prior to Lemon's election, MB's Management Committee would ministerially confirm an attorney/employee's STL request and simply inform the Board of Directors about the attorney/employee's election to participate in the STL plan.

94. However, instead of approving Lemon's election at the typical ministerial Management Committee level, MB subjected Lemon to insensitive questioning about her health at the Management Committee level and required her to obtain medical documentation for further consideration.

95. Upon information and belief, the Management Committee forced Lemon to present her STL plan request to the full MB Board of Directors in retaliation for her participation in the EEO investigation and her specific complaints about a member of the Controlling Group.

19

96. Although Lemon obtained the requested medical documentation from her physician that confirmed the need for accommodations through the STL plan and offered to provide the same to MB's director of administration, MB informed Lemon that she instead would need to address MB's Board of Directors with her request to participate in the STL plan, notwithstanding her having unquestionable, multiple qualifying events.

97. MB placed the issue of Lemon's STL request on the agenda for the October 19, 2016 meeting of MB's Board of Directors.

98. By placing Lemon's STL request on the Board's agenda, MB facilitated the open discussion among board members about Lemon's private health condition, which was an underlying basis for the leave request, in an effort to embarrass Lemon in retaliation for her participation in the EEO investigation, upon information and belief.

99. During the board meeting of October 19, 2016, Borchers directed Lemon and one of the female complainants to leave the meeting so that the board may discuss the matter in their absences, purportedly because Lemon and the female complainant engaged an attorney to advise and assist them after having been interviewed by Joyner, who clarified that he did not represent them.

100. On information and belief, the other complainant had not made any election to participate in the STL plan that year, but was directed to leave the board meeting because MB had planned to discuss discriminatory and retaliatory acts concerning the female complainant and Lemon.

20

101.    Upon information and belief, during the time that Lemon and one of the female complainants were forced to leave the meeting, Borchers and the Controlling Group made their negative opinions towards Lemon and her STL request known to the other shareholders and directors at the meeting and suggested that Lemon's request should be denied in retaliation for her participation in the EEO investigation into discrimination at MB. When Lemon and the female complainant were permitted to return to the meeting, Borchers led a brief discussion amongst the shareholders about Lemon's STL election.

102.    During this discussion, Richardson, who previously referenced Lemon as "playing the black card," intentionally misled the Board of Directors by stating that Richardson "wrote the policy" which "was for prolonged family illness," and stated that she did not "see how" Lemon's qualifying events applied to the STL plan. She made these statements despite previously indicating that the plan was "primarily driven by [a shareholder's] plan for adoption."

103.    Upon information and belief, Richardson's intentional misleading of the Board of Directors was motivated by her racial animus towards Lemon, as described above.

104.    After this brief discussion about Lemon's STL election, the board took a vote of whether to grant or deny the STL election by Lemon. On information and belief, all but three of the approximate twenty board members in attendance voted to deny Lemon's election to invoke the right to participate in the STL plan even though she was otherwise qualified under MB's policies.

105. On information and belief, MB's Board of Directors had never previously voted on this issue of STL election as it pertained to its Caucasian employees, including those seeking short-term leave for such events as cataract surgery, undisclosed illnesses, and even for one Caucasian employee who did not otherwise qualify for the STL plan, but was granted participation by MB nonetheless.

106. On information and belief, prior to Lemon's request for STL plan participation, MB had never required any other Caucasian shareholders or employees to disclose their specific medical conditions to prove qualification; never required other shareholders or employees to present their request for STL plan participation to the Board of Directors for approval; and never required the shareholder or employee to present physician statements confirming health conditions.

107. Following the rejection of Lemon's election to participate in MB's STL plan, the Managing Shareholder, Borchers, discussed "punishment" for "bad behavior" and specifically mentioned Lemon's name along with that of another female complainant for having "hired a lawyer" back in June 2016 to discuss the sincere concerns each had about MB's gender discrimination and its hostile work environment towards female attorneys and employees.

108. During the board meeting of October 19, 2016, Borchers also suggested and discussed a range of punishment for Lemon with MB's Board of Directors, including public censure, monetary penalties, and termination.

109. On information and belief, MB's purpose for denying Lemon's valid and qualified request for STL leave was to cause Lemon to experience financial and

22

emotional costs that would serve, in part, as "punishment" in significant part for having participated and assisted the complainants during the course of MB's "investigation" through Kevin Joyner, as well as to further their unlawful race and gender discrimination.

110. Following the denial of Lemon's STL, the Board of Directors took up discussion of "Shareholder Conduct" at the direction of Borchers. During this discussion, two shareholders suggested that MB have a "reset" of relations between shareholders; however, Borchers disagreed that MB could have such a "reset."

111. After this discussion, the Board of Directors took up consideration of Policy Review and Revisions, including amendments to the Attorney Compensation Plan, at the direction of Borchers.

112. During discussion of the Policy Review and Revisions, David Beatty proposed making an amendment to the Attorney Compensation Plan that would specifically punish Lemon if she was unable to meet her billable hour requirements for 2016, which was difficult in light of the Board of Directors' retaliatory denial of Lemon's STL.

113. This amendment was in violation of MB's unwritten but widely understood policy of not making policy changes that would negatively impact a specific shareholder at the time of making the policy change. On information and belief, the amendment was intended for the specific purpose of causing harm to Lemon.

114. Upon information and belief, Beatty suggested, and the Board of Directors approved, this amendment at the direction of Borchers and the Controlling Group to punish Lemon as Borchers desired.

115. After the October 19, 2016 meeting, Borchers unilaterally contacted one of MB's largest clients to inform the client that client management responsibility was being transferred to a member of the Controlling Group. Upon information and belief, this action was not taken in the best interests of MB, but instead was taken in an effort to further bolster the Controlling Group's control of MB.

116. On October 7, 2016, a day following Lemon's request for STL, but prior to the board's consideration of the request, MB's Management Committee circulated notes of its meetings held on July 26, 2016, August 2, 2016, and August 16, 2016. These notes contained a substantially higher level of detail on information and belief than notes previously provided to MB's shareholders.

117. The notes purportedly covered a conversation that Lemon had with MB's shareholder and Management Committee member, Alice Bonnen ("Bonnen"), but the content included inaccurate statements attributed to Lemon and contained a critical omission by Bonnen.

118. The inclusion of such statement negated the purpose of the notes which were disseminated to persuade the Board of Directors that Lemon's conduct showed that there is unresolved conflict and that from a business standpoint the Management Committee should consider action to resolve Lemon's alleged undermining of the firm.

119. In reality, Lemon's actual comments to Bonnen instead showed that Lemon had no intent to undermine the firm. This notwithstanding, Bonnen and other members of the Management Committee knowingly retained the misleading information in the notes to deceive MB's shareholders for purposes of discrediting and retaliating against Lemon.

120. The notes further highlight the disparate treatment of the complainants that continued after Joyner's "investigation" where a male shareholder's interaction with a staff member involving the male shareholder yelling and cursing at a female staff member resulting in her fear of the male shareholder was described as his merely addressing the female staff member "loudly and angrily." No mention of his previous similar interaction with a different female staff member was made and no statements regarding remedial measures to be taken regarding his unacceptable behavior or any indication that his conduct was at odds with acceptable workplace behavior were expressed in the Management Committee notes.

121. Upon information and belief, these Management Committee meeting minutes were circulated between the time Lemon invoked the STL plan and the Board of Directors' vote on the same in an effort to discredit Lemon and prejudice the Board of Directors against her, at the direction of Borchers.

122. Following the dissemination of the Management Committee meeting minutes mentioned above, the Management Committee failed to circulate any future meeting minutes while Lemon remained employed by MB.

25

123. Upon information and belief, this deliberate withholding of information was intended to shield Borchers and the Management Committee from scrutiny by the Board of Directors, specifically with regard to the Management Committee's discussion of race and gender discrimination issues generally and Lemon specifically.

124. Nevertheless, on or about November 2, 2016, Lemon became aware that MB's Management Committee had openly discussed racial and gender discrimination and its retaliatory actions against Lemon and the complainants during at least one of its meetings.

125. Lemon also became aware that MB's Management Committee had specifically discussed terminating her as part of the retaliation and that another shareholder had specifically discussed a motion to terminate Lemon's employment.

126. Around November 4, 2016, a poorly noticed meeting was called for the shareholders of MB's ChemBio practice group of which Lemon was a member. During this meeting, MB's shareholder/employees interrogated Lemon by asking about her "intentions" and whether she was going to sue the firm.

127. MB's ChemBio practice group further openly chastised Lemon on or about November 4, 2016 for having hired a lawyer to address her sincere concerns regarding MB's hostile work environment towards women.

128. In a veiled threat, one shareholder/employee, Bonnen, ominously asked Lemon at the November 4, 2016 ChemBio practice group meeting what would happen "if somebody pushed" her "off the cliff."

26

129. Around this period, Lemon was repeatedly asked to speak with MB's Board of Directors to answer "some tough questions." On November 5, 2016, MB's Managing Shareholder, Borchers, emailed Lemon to inform that Lemon was being placed on the agenda for the Board of Directors meeting scheduled for November 8, 2016 based on a meeting with ChemBio members regarding "workplace concerns" with no further specification.

130. Lemon subsequently provided MB's Management Committee with documentation from a health care provider that indicated she needed to avoid stress during this time for health reasons. MB's hostile work environment had been taking a toll on Lemon's health by causing her to experience difficulty in breathing through the exacerbation of her asthmatic condition.

131. Despite Lemon's ongoing health issues which qualified for MB's STL plan, Lemon continued working through those health issues to minimize the impact of the retaliatory, punitive amendment to the Attorney Compensation Plan.

132. On December 23, 2016, Lemon tendered her resignation because she could no longer work under the extraordinary stress, humiliation and hostile work environment that she had been experiencing within MB's workplace, as alleged herein.

133. Although Lemon has been able to obtain employment since being forced from MB, Lemon's opportunities for compensation have been significantly diminished.

27

134. On or about January 3, 2017, Borchers and the Controlling Group left MB to form their own firm, Borchers, Hall, Hatfield, Purks & Wall, PLLC, doing business as Sage Patent Group ("Sage Patent Group").

135. After learning of the departure of Borchers and the Controlling Group, it became apparent that Borchers and the Controlling Group had been intending to form their own firm for some time, and were using their control of MB for their own selfish gain.

136. For example, on November 12, 2016, while Lemon was suffering from retaliatory and discriminatory acts urged by Borchers and the Controlling Group, the website for Sage Patent Group was registered.

137. Additionally, on December 12, 2016, while still employed by MB, Borchers and the Controlling Group signed Articles of Incorporation for Sage Patent Group.

138. Upon information and belief, Borchers and the Controlling Group retaliated against Lemon with impunity and without fear of retribution because they knew they were leaving MB to start their own firm.

139. In fact, MB shareholders acknowledged that Borchers and the Controlling Group "used many of us to help them carry the bags out to the car" and lamented "what they were able to easily do in 2016 without meaningful protest." Upon information and belief, these statements referred in part to the role of Others in facilitating Borchers and the Controlling Group's discrimination and retaliation against Lemon.

## FIRST CLAIM FOR RELIEF:
### (Section 1981—Disparate Treatment)

140.    The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

141.    Lemon and MB were parties to both an Employment Agreement and a Shareholders' Agreement. Inherent in those agreements was Lemon's entitlement to equal treatment under the laws.

142.    On information and belief, when Lemon submitted her STL request to MB on or about September 14, 2016, Lemon was qualified to participate in MB's STL plan under the terms and conditions set forth in MB's policies, procedures, and customary practices applicable at the time.

143.    On information and belief, prior to Lemon's election to participate in the firm's STL plan, MB had white or Caucasian shareholder employees (collectively "prior applicants") who had likewise requested to participate in the firm's STL plan.

144.    On information and belief, MB ministerially confirmed the requests of the prior white or Caucasian applicants at the Management Committee level, including at least one prior applicant who was not qualified to participate under the applicable policies, without the requirement to provide medical documentation, present to Board of Directors, and/or submit to a vote by the Board of Directors.

145.    On information and belief, for its white or Caucasian employees, MB ministerially confirmed their STL requests at the Management Committee level.

146.    MB denied Lemon the option to have her STL request confirmed at the Management Committee level in a ministerial manner. Instead MB required that

29

Lemon obtain and provide medical documentation, present her request to the Board of Directors, and submit for a vote after full disclosures about her health condition so that her request could be rejected for discriminatory reasons under guiding influence of Borchers.

147.    Moreover, on information and belief, MB had never before changed the Attorney Compensation Plan to adversely affect a Caucasian shareholder employee at the time of the change as it did to Lemon.

148.    On information and belief, Borchers was instrumental in influencing other board members to treat Lemon differently because of race, as alleged herein.

149.    On information and belief, MB and Borchers denied Lemon the ability to elect or otherwise participate in the STL plan because she was African-American even though she was otherwise qualified.

150.    In violation of 42 U.S.C. § 1981, MB and Borchers denied Lemon the right to make and enforce her contracts with MB and to have the full and equal benefit of all laws when MB and Borchers intentionally discriminated against Lemon because of her race by rejecting her request to participate in MB's STL plan even though she was fully qualified for the same.

151.    As a direct and proximate result of MB's and Borchers's acts of discrimination against Lemon, as alleged herein, Lemon has incurred damages in an amount to be determined at trial, but in excess of $75,000.

152. On information and belief, MB and Borchers engaged in discriminatory practices against Lemon, as alleged herein, with malice or with reckless indifference to the federally protected rights of Lemon as an aggrieved individual.

<u>SECOND CLAIM FOR RELIEF</u>:
(Title VII-Race Discrimination)

153. The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

154. Lemon was an employee of MB, for several reasons, including:

a. She executed an Employment Agreement with MB setting forth the terms and conditions of her employment;

b. The Employment Agreement was not superseded when Lemon became a shareholder of MB, and Lemon's shareholder status depended on her remaining an employee of MB;

c. MB treated Lemon as an employee for tax purposes and continued to do so even after she became a shareholder of MB;

d. Lemon was subject to oversight by MB and required to report to, *inter alia*, the Management Committee and Borchers as the Managing Shareholder;

e. Lemon's work was subject to review by MB through its attorneys; and

f. MB had the power to terminate Lemon's employment even after she became a shareholder of MB.

31

155. On information and belief, MB wrongfully and intentionally discriminated against Lemon because of her race as an African-American in violation of *Title VII of the Civil Rights Act of 1964*, as amended and codified in 42 U.S.C. § 2000e, *et seq.* in at least the following ways:

    a.    Even though Lemon was qualified to invoke the STL plan, MB denied her election to participate in the STL plan because of Lemon's race as an African-American and gender as a female or otherwise used her race and gender as a motivating factor in denying her election to participate;

    b.    Notwithstanding Lemon's complaints, MB not only failed to promptly and effectively remediate its hostile work environment towards Lemon in retaliation for her having reported illicit discrimination, MB through its managers encouraged or continued with the ongoing harassment and retaliation against her.

156. Even if MB did not have the specific discriminatory animus to discriminate or retaliate against Lemon, which is denied, MB's adverse actions were caused or influenced by MB's partners, members, principals, shareholders, managers and/or employees who were motivated by a discriminatory animus because of her race and gender that were intended to cause, and in fact, did cause, MB's adverse actions and retaliation against Lemon.

157. As a direct and proximate result of MB's acts of discrimination against Lemon on the basis of race, as alleged herein, Lemon has incurred damages in an amount to be determined at trial, but in excess of $75,000.

THIRD CLAIM FOR RELIEF:
(Title VII-Retaliation)

158. The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

159. Lemon was an employee of MB, for several reasons, including:

a. She executed an Employment Agreement with MB setting forth the terms and conditions of her employment;

b. The Employment Agreement was not superseded when Lemon became a shareholder of MB, and Lemon's shareholder status depended on her remaining an employee of MB;

c. MB treated Lemon as an employee for tax purposes and continued to do so even after she became a shareholder of MB;

d. Lemon was subject to oversight by MB and required to report to, *inter alia*, the Management Committee and Borchers as the Managing Shareholder;

e. Lemon's work was subject to review by MB through its attorneys; and

f. MB had the power to terminate Lemon's employment even after she became a shareholder of MB.

160. Lemon engaged in activity protected under Title VII, 42 U.S.C. § 2000e-3, *et seq.*, in June 2016 when Lemon reported in good faith her personal knowledge and understanding to Joyner about gender discrimination, including a hostile work environment towards female attorneys/employees, in MB's workplace in June 2016.

161. Because of Lemon having engaged in the protected activity, as alleged above, MB through its managers intentionally caused Lemon to experience and suffer through the materially adverse employment actions that were individually and collectively meant to punish her for, and dissuade her from, engaging in protected activity.

162. Specifically, the materially adverse employment actions that MB caused Lemon to be subjected to, or knowingly failed to prevent or otherwise protect her from, include the following actions:

    a.    permitting Lemon to be subjected to continuous, frequent scorn, humiliation and ridicule by other attorneys and employees in the demeaning open remarks and statements made to Lemon and to others about Lemon for having reported gender discrimination, as alleged herein;

    b.    denying Lemon the opportunity to participate in MB's STL plan even though she was otherwise qualified;

    c.    requiring that Lemon's STL request be considered by the Board of Directors instead of by the Management Committee so that Lemon could be humiliated and unnecessarily embarrassed by

34

the open discussion of her request, including very private references about her health condition to all the board members with whom she worked; and

d.     causing Lemon to believe and live in fear that she would be subjected to termination for having participated, and having hired an attorney to assist her in her participation, in the investigation of MB's hostile work environment.

163.    As a direct and proximate result of MB's acts of retaliation against Lemon, as alleged herein, Lemon has suffered harms, losses, and damages in an amount to be determined at trial, but in excess of $75,000.

## FOURTH CLAIM FOR RELIEF
(Breach of Fiduciary Duty)

164.    The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

165.    MB is a closely-held professional association.

166.    At all times relevant, Borchers was an officer, director, and controlling shareholder of MB.

167.    Borchers, along with the Controlling Group, exercised actual control over MB in at least the following ways:

a.     They controlled the Management Committee through Borchers, who led discussion amongst the Management Committee and influenced its decisions;

35

b.    They controlled the Board of Directors through the Management Committee by setting special Board of Directors meetings, preparing and circulating agendas, and making recommendations which the Board of Directors would approve as a matter of course;

c.    They unilaterally removed one of the female complainants from the Management Committee to stifle a dissenting voice;

d.    They controlled the firm's revenues and the abilities of other shareholders to earn more than their base compensation through their control of major client relationships, and controlled the firm's billing through Borchers's authority and oversight;

e.    They expressly excluded individuals outside of the Controlling Group from exercising control, including by giving Borchers consolidated authority of MB's President and Managing Shareholder and otherwise disregarding the authority of other officers; and

f.    They manipulated the flow of information from the Management Committee to the Board of Directors and shareholders by including factually incorrect statements, delaying the release of minutes to prejudice directors and shareholders against Lemon, and outright failing to release certain other minutes.

36

168. In addition to the foregoing, Borchers's position as Managing Shareholder of MB—the only officer position with any actual authority in practice—gave her actual control of MB.

169. As controlling shareholder, officer, and director of MB, and Lemon's law partner, Borchers owed a direct and special fiduciary duty to Lemon.

170. Borchers used her actual control of MB, as well as her voting power in MB, to subject Lemon to disparate treatment based on her sex and race, foster a hostile work environment, withhold information given to other shareholders, retaliate against her for voicing her sincere concerns about discrimination at MB, and otherwise treat her inequitably and differently from other shareholders.

171. Borchers breached her fiduciary duty to Lemon by failing to treat her equitably and instead discriminating and retaliating against her. Without limiting the generality of the foregoing, Borchers violated her duty to Lemon by impermissibly discriminating against her based on her gender and race, denying her qualifying STL/STD request, subjecting her to a hostile work environment, threatening to take punitive action against her for voicing her sincere concerns about discrimination at MB and amending the Attorney Compensation Plan solely to penalize Lemon for the same.

172. Borchers also breached her fiduciary duties to MB due to the sustained, systemic failure to monitor for compliance with law, including compliance with federal anti-discrimination laws and regulations.

173. Borchers further breached her fiduciary duties by failing to act in good faith and in the best interests of the corporation when she decided to promote a hostile work environment in an effort to force Lemon to terminate her employment, deny Lemon's STL/STD request, amend the Attorney Compensation Plan solely to punish Lemon, and otherwise retaliate and discriminate against Lemon based on her gender and race.

174. These actions were made neither in the best interest of the corporation nor in good faith, but instead in the interests of Borchers and in retaliation for Lemon voicing sincere concerns about discrimination at MB.

175. Moreover, Borchers failed to act as a reasonably prudent person in similar circumstances when she failed to implement a system to monitor and report unlawful discrimination.

176. As alleged herein, Borchers actions were made in bad faith and unreasonably for at least the following reasons:

    a. Borchers's actions alleged herein were made in unlawful retaliation for Lemon's participation in the EEO investigation and for voicing her sincere concerns about the hostile work environment at MB fostered by Borchers; and

    b. Despite Lemon's obvious qualification for the STL plan and MB's past approval of STL plans as a matter of course, Borchers required Lemon to present her claims to the Management

38

Committee and then the Board of Directors, and ultimately caused the unreasonable denial of Lemon's STL plan.

177. The retaliatory actions of Borchers and MB alleged herein cannot be attributed to any rational business purpose—indeed, there can be no rational business purpose where actions are motivated by unlawful discrimination and retaliation, as were the actions herein alleged. Accordingly, the business judgment rule does not apply to the actions of Borchers complained of herein.

178. As a result of the breaches of fiduciary duties to MB by Borchers, Lemon suffered separate and distinct injuries, including denial of her STL/STD claim, amendment of the Attorney Compensation Plan solely to penalize Lemon, and promotion of a hostile work environment to cause Lemon to terminate her employment, all in retaliation for Lemon voicing sincere concerns about discrimination at MB.

179. Due to the actions of Borchers, Lemon has suffered damages in an amount to be proven at trial, in excess of $75,000.

### FIFTH CLAIM FOR RELIEF
(Breach of Implied Covenant of Good Faith and Fair Dealing)

180. The foregoing allegations are hereby realleged and fully incorporated by reference as if fully set forth herein.

181. Lemon and MB were parties to an Employment Agreement.

182. Lemon, MB, and Borchers were parties to a Shareholders' Agreement.

183. Under North Carolina law, the Employment Agreement and Shareholders' Agreement contained an implied covenant and duty that the parties

exercise good faith and fair dealing with respect to their obligations under the agreements.

184.   MB and Borchers breached the implied covenants of good faith and fair dealing in the Shareholders' Agreement by, *inter alia*, denying her STL, changing the Attorney Compensation Plan specifically to punish Lemon, fostering a hostile work environment, and otherwise discriminating and retaliating against her based on her gender and race.

185.   MB breached the implied covenants of good faith and fair dealing in the Employment Agreement by, *inter alia*, denying her STL, changing the Attorney Compensation Plan specifically to punish Lemon, fostering a hostile work environment, and otherwise discriminating and retaliating against her based on her gender and race.

186.   MB and Borchers deprived Lemon of the benefits she bargained for in the Employment Agreement and Shareholders' Agreement.

187.   As a direct and proximate result of MB's and Borchers's breaches of the covenants of good faith and fair dealing implied in the Employment Agreement and Shareholders' Agreement, Lemon has incurred damages in an amount to be proven at trial, in excess of $75,000.

<u>DEMAND FOR JURY TRIAL</u>:

Pursuant to Fed. R. Civ. P. 38 and 42 U.S.C. § 1981(a)(c), Lemon hereby makes demand for a trial by jury for all triable issues.

## PRAYER FOR RELIEF:

WHEREFORE, Lemon prays unto the Court as follows:

1.      That Lemon receive judgment against Defendants jointly and severally in an amount to be determined at trial, but in excess of $75,000 for all applicable compensatory damages for pecuniary and non-pecuniary harms and losses, including without limitation, that for emotional pain, suffering, mental anguish, loss of enjoyment of life, damage to reputation, and any other applicable damages under 42 U.S.C. § 1981, *et seq.* and common law;

2.      That Lemon receive punitive damages against Defendants jointly and severally, pursuant to 42 U.S.C. § 1981a(b)(1);

3.      That Lemon recover from Defendants jointly and severally all pre-judgment and post-judgment interest and court costs, including without limitation expert witness fees, deposition costs, and attorneys' fees, as permitted by law;

4.      That Lemon receive a jury trial as to all matters so triable; and

5.      That the Court grant Lemon such other and further relief as the Court deems just and proper.

This the 19th day of November, 2018.

BAILEY & DIXON, LLP

By:     */s/ J. Heydt Philbeck*
        J. Heydt Philbeck
        434 Fayetteville Street, Suite 2500
        Raleigh, North Carolina 27601
        Telephone: (919) 828-0731
        Email: hphilbeck@bdixon.com

41

SHANAHAN McDOUGAL, PLLC


By:     */s/ Brandon S. Neuman*
        Brandon S. Neuman, NCSB # 33590
        Nathaniel J. Pencook, NCSB # 52339
        128 E. Hargett St., Third Floor
        Raleigh, North Carolina 27601
        Telephone: (919) 856-9494
        bneuman@shanahanmcdougal.com
        npencook@shanahanmcdougal.com

        *Attorneys for Plaintiff Lemon*


EXHIBIT
A

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 433-2017-00778 |

and EEOC

State or local Agency, if any

| Name (indicate Mr., Mrs., Mrs.) | Home Phone (incl. Area Code) | Date of Birth |
|---|---|---|
| Shawna Cannon Lemon | (919) 678-1101 | 08/07/1968 |

| Street Address | City, State and ZIP Code |
|---|---|
| 301 Keybridge Drive, Morrisville, NC 27560 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (incl. Area Code) |
|---|---|---|
| Myers Bigel, PA | 15-100 | (919) 854-1400 |

| Street Address | City, State and ZIP Code |
|---|---|
| 4140 Parklake Avenue, Suite 600, Raleigh, NC 27612 | |

| Name | No. Employees, Members | Phone No. (incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN
☒ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest: 10-19-2016    Latest: 12-31-2016

☒ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

The particulars are contained in the attached Exhibit A, which is incorporated herein by reference.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State or Local Agency Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the above is true and correct. | SIGNATURE OF COMPLAINANT |
| 2/28/17 | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date    Charging Party Signature | |

## EXHIBIT A

The particulars of my charge of discrimination and retaliation are as follows:

I.       I am a black female of African-American descent. From September 2001 to December 31, 2016 ("tenure"), I was employed full-time by Myers Bigel, P.A. (formerly "Myers Bigel & Sibley, P.A." and "Myers Bigel Sibley & Sajovec, P.A.,") (collectively "Respondent") as a duly licensed attorney who practiced in the area of patent law. In addition to a *juris doctor*, I have also earned a Ph.D. in Biomedical Sciences/Pharmacology. I had signed an employment agreement with Respondent. Each year, Respondent issued me IRS W-2 forms to report my income. Respondent was run by the board of directors, which in turn accepted recommendations from a managing committee.

II.      At all times during the tenure of my employment, I met or exceeded all reasonable expectations of my employer and excelled in the performance of my job duties. During this tenure, I had never been subjected to any disciplinary actions. As a general practice, I treated all supervisors, colleagues, and subordinates in a professional manner with fairness, respect and good will.

III.     On or about June 2, 2016, I met with Respondent's lawyer, Kevin Joyner ("Joyner"), to discuss the sex discrimination, including the hostile work environment that I had been experiencing while working for Respondent. Respondent had hired Joyner to investigate and advise it as to complaints of sex discrimination it had received from three of its lawyer-employees (collectively "EEO complainants"). On June 14, 2016, Joyner reported to Respondent's board of directors in a "confidential memorandum" the information that I had provided him that confirmed Respondent's hostile work environment. During a board of directors' meeting on June 15, 2016, Respondent's board member, Scott Hatfield, openly referred to my allegations about the hostile work environment as "idiotic." Another board member responded that he would have said "much worse [than Hatfield]" in describing his reaction to my complaint. A third board member chimed in that the female complainants (including myself) needed to just "grow up" and stop complaining.

IV.     In his memorandum of June 14, 2016, Joyner stated, "Shawna characterizes her complaint as one of a 'hostile work environment' though not necessarily based on discrimination. Yet, she does not believe that she would have been treated the same way were she a male." Although the memorandum specifically (and erroneously) states that I did not characterize my complaint as being necessarily based on discrimination and fails to indicate racial discrimination, after the June 15, 2016 board meeting, Respondent's shareholder Julie Richardson told another shareholder that I play the "black card" too much, notwithstanding the fact that at that point, I had never made any complaints to Respondent about "race" or my being "black."

Richardson's comment was instead based exclusively on her own inaccurate stereotype about African-Americans who may have concerns about their workplace.

V.      On July 13, 2016, Respondent's board of directors expelled one of the EEO complainants, Elizabeth Stanek, as a member of the management committee in retaliation for having complained about the hostile work environment, as referenced in Joyner's confidential memorandum. In my meeting with Joyner, I had substantiated Stanek's complaints about a hostile work environment because of sex/gender in the workplace.

VI.     On or about September 14, 2016, I had elected to participate in the short-term leave ("STL"), pursuant to Respondent's policies and procedures. In the past, Respondent's management committee would inform the board of directors of the employee's election to participate in the STL plan. However, Respondent refused my election to participate in the STL plan at the management-committee level. Instead, Respondent placed the issue for discussion and vote during the board of director's meeting scheduled for October 19, 2016. During this meeting, I was asked to leave along with Elizabeth Stanek, one of the other EEO complainants. All but five (including myself and Stanek) of the approximate twenty board members voted to deny my election to invoke the right to participate in the STL plan even though I was otherwise qualified. On information and belief, the board of directors had never previously voted on this issue as it pertained to its other employees, including those seeking STL for cataract surgery, death of a niece, severe back pain, and an undisclosed illness.

VII.    Following this rejection of my election to participate in the STL plan, the managing shareholder, Lynne Borchers discussed "punishment" for the "bad actors," where she specifically mentioned my name and that of EEO complainant, Stanek, for "hiring a lawyer" back in June 2016 to discuss the hostile work environment. Borchers suggested a range of punishment to the board of directors, including public censure, removal as a director, monetary penalties, and/or termination. On information and belief, the purpose of denying my valid request for STL leave was to cause me to experience financial costs that in effect would serve as a "fine" for having participated and assisted the EEO complainants during the investigation.

VIII.   On October 7, 2016, Respondent's management committee circulated notes of its meetings held months prior. These notes dated August 2, 2016 contained a substantially higher level of detail than notes previously provided to Respondent's shareholders. The notes further covered a conversation that I had with Respondent's shareholder and management committee member Alice Bonnen ("Bonnen"), but were inaccurate and contained a critical omission. The inclusion of such statement negates the purpose of the notes which were disseminated to persuade the board of directors that my conduct showed that there is unresolved conflict and that from a

business standpoint the management committee should consider action to resolve this undermining of the firm. My actual comments to Bonnen instead showed that I did not have any intent to undermine the firm. The notes further highlight the disparate treatment of the EEO complainants where a male shareholder's interaction with a staff member involving the male shareholder yelling and cursing at a female staff member was described as his addressing the female staff member "loudly and angrily." No mention of his previous similar interaction with a female staff member was made and no statements regarding remedial measures to be taken regarding his unacceptable behavior were expressed in the management committee notes.

IX.     On or about November 2, 2016, I became aware that Respondent's management committee had discussed racial discrimination and its retaliatory actions against me and the EEO complainants. I also became aware that the management committee had specifically discussed terminating me and that another shareholder had specifically discussed a motion to terminate my employment.

X.      Around November 4, 2016, a meeting was called for the shareholders of Respondent's ChemBio practice group of which I was a member. During this meeting, Respondent's shareholder/employees asked about my "intentions" and inquired whether I was going to sue the firm. One shareholder/employee, Bonnen, asked me what would happen "if somebody pushed" me "off the cliff." Around this period, I was repeatedly asked to speak with the board of directors to answer "some difficult questions." On November 5, 2016, Respondent's manager Borchers emailed me to inform that she was placing me on the agenda for the November 8, 2016 board of directors meeting based on a meeting with ChemBio members regarding workplace concerns, but specified no further. I subsequently provided the management committee with a doctor's note that indicated I needed to avoid stress during this time for health reasons. The hostile work environment was taking a toll on my health by causing me to experience difficulty in breathing through the exacerbation of my asthmatic condition.

XI.     On December 23, 2016, I tendered my resignation because I could no longer accept the hostile work environment that I had been experiencing within Respondent's workplace.

XII.    On information and belief, Respondent wrongfully and intentionally discriminated against me because of my gender as a female and race and color as an African-American and retaliated against me for having engaged in protected activity in violation of *Title VII of the Civil Rights Act of 1964*, as amended and codified in 42 U.S.C. § 2000e, *et seq.* in at least the following ways:

A.      Even though I was qualified to invoke the STL plan, Respondent denied my election for STL because of my gender and/or race and in retaliation for having engaged in

Protected activity by reporting discriminatory and retaliatory acts to Respondent's EEO investigator, Kevin Joyner.

B.     Notwithstanding my complaints, Respondent not only failed to promptly and effectively remediate its hostile work environment towards me in retaliation for having reported illicit discrimination, Respondent encouraged continued retaliation and encouraged a continued hostile work environment against me along with the other EEO complainants.

XIII.   On information and belief, even if Respondent did not have the specific discriminatory animus to terminate me and/or retaliate against me, which is denied, Respondent's adverse actions were caused or influenced by Respondent's partners, members, principals, shareholders, managers and/or employees who were motivated by a discriminatory animus because of my race and gender that were intended to cause, and did in fact cause, Respondent's adverse actions and retaliation against me.

IX.     I incorporate by reference the intake questionnaire that I filed with the EEOC on January 10, 2017.

2/28/17
Date

Shawna Cannon Lemon

EEOC Form 161-B (11/16)

EXHIBIT
B

To: Shawna C. Lemon
301 Keybridge Drive
Morrisville, NC 27560

From: Raleigh Area Office
434 Fayetteville Street, Suite 700
Raleigh, NC 27601

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 433-2017-00778 | Generosa J. Tabor, Investigator | (919) 856-4088 |

(See also the additional information enclosed with this form.)

NOTICE TO THE PERSON AGGRIEVED:

Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA): This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☒ More than 180 days have passed since the filing of this charge.

☐ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

Age Discrimination in Employment Act (ADEA): You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Thomas M. Colclough,
Deputy Director

1-25-18
(Date Mailed)

Enclosures(s)

cc: Kevin Joyner
OGLETREE DEAKINS
4208 Six Forks Road
Suite 1100
Raleigh, NC 27609

J. Heydt Philbeck
BAILEY & DIXON
434 Fayetteville Street
Suite 2500
Raleigh, NC 27601