IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:18-CV-200-FL

| | | |
|---|---|---|
| SHAWNA CANNON LEMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| MYERS BIGEL, P.A. f/k/a Myers Bigel & | ) | |
| Sibley and Myers Bigel Sibley & Sajovec, | ) | |
| P.A.; LYNNE A. BORCHERS; and | ) | |
| UNNAMED OTHERS, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on defendants' motion to dismiss (DE 17) and plaintiff's

motion to amend complaint (DE 26). The matters have been fully briefed, and in this posture the

issue raised are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiff initiated this action by complaint filed April 4, 2018, against defendants Myers

Bigel, P.A. ("MB"), Lynne A. Borchers ("Borchers"), and unnamed others, in Wake County

Superior Court, asserting discrimination and retaliation claims under the Civil Rights Act of 1964,

as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII") and discrimination claim under the Civil

Rights Act of 1871, as amended, 42 U.S.C. § 1981 ("§ 1981"). Defendants subsequently removed

the action to this court.

Following the court's grant of multiple consent motions for time extensions, defendants filed

the instant motion to dismiss on August 6, 2018. On November 19, 2018, plaintiff filed the instant

motion to amend complaint with proposed amended complaint adding factual allegations in support of plaintiff's federal claims and two additional claims arising under North Carolina law for breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing.

## STATEMENT OF THE FACTS

The facts alleged in proposed amended complaint may be summarized as follows.[1]

A.      Plaintiff's Employment at Defendant MB

From August 24, 2001, to this current date, plaintiff has been an attorney duly licensed to practice law by the North Carolina State Bar.  Plaintiff also possesses a doctorate in biomedical sciences/pharmacology.  At all times relevant herein, plaintiff's law practice has been focused in the area of patent law.

Plaintiff alleges from around September 2001 to December 31, 2016, she was employed by defendant MB to serve as a patent lawyer.  On or about September 4, 2001, plaintiff and this defendant memorialized the terms and conditions of plaintiff's employment in an employment agreement, which allowed defendant MB to terminate plaintiff's employment "without cause and at any time, by giving at least thirty (30) days' written notice . . . ."  (Prop. Am. Compl. (DE 26-1) ¶ 20).  The employment agreement also set terms and conditions of plaintiff's employment with defendant MB, including the following:

1.      Requiring plaintiff "to devote all necessary time and [her] best efforts to the performance of [her] duties as a lawyer for [defendant MB] in accordance with the highest ethical standards of the legal profession and the rules, regulations, and

---

[1] Because the arguments raised for dismissal of the claims and allegations of the proposed amended complaint parallel those raised with regard to the original complaint, the court sets forth here a summary of the facts alleged in the proposed amended complaint.

policies of [defendant MB] as adopted from time-to-time";

2. Limiting her ability to work and earn income outside of defendant MB, including income from professional services, teaching fees, director fees, and honorariums;

3. Requiring her to maintain "professional competence"; and

4. Requiring her "to observe and comply with the personnel policies, the operating policies and procedures, and all other rules and regulations of [defendant MB]" and "to carry out and perform orders, directions, and policies stated by [defendant MB] to [her.]"

(Id. ¶ 21).

On or about January 2, 2007, plaintiff entered into the tenth modification to a shareholders' agreement between defendant MB and the 20 shareholders of defendant MB at that time, which has been modified and amended thereafter. In executing the shareholders' agreement, plaintiff agreed to purchase 5,000 shares of defendant MB for a total $62,241.17. Plaintiff alleges no provision of the shareholders' agreement superseded plaintiff's employment agreement; rather, the shareholders' agreement tied continued ownership of stock to plaintiff's continued employment with defendant MB. Plaintiff alleges that defendant MB would not permit a shareholder whose employment was terminated to remain as a shareholder of defendant MB, despite an amendment to the shareholder's agreement in 2009 removing the word "employee." (Id. ¶ 42). Plaintiff alleges the employment agreement continued in full force and effect after plaintiff became a shareholder of defendant MB. Plaintiff alleges she remained subject to defendant MB's control as an employee of defendant MB and continued to be compensated as an employee rather than as a shareholder.

At all times relevant, defendant MB had a strict quality control policy. Defendant MB

required plaintiff and defendant MB's other shareholders to comply with the quality control policy, by which defendant MB required plaintiff and other shareholders to submit their work product for substantive review by another shareholder to ensure that assignments were met satisfactorily and provide plaintiff with feedback regarding the same.

The quality control policy further required plaintiff and defendant MB's other shareholders to submit all draft bills to the managing shareholder "for compliance and [to] take appropriate action as necessary." (Id. ¶ 23). During 2016, plaintiff alleges all attorneys at the firm reported to the management committee, and to defendant Borchers as managing shareholder.

During the tenure of plaintiff's employment, including after plaintiff became a shareholder, defendant MB issued plaintiff a Form W-2 for each tax year for purposes of reporting her gross income to the United States Internal Revenue Service. Plaintiff never received a Schedule K-1 from defendant MB.[2] Plaintiff's compensation was governed at all relevant times by the attorney compensation plan, an addendum to the employment agreement.

At all times during her tenure of employment, plaintiff met or exceeded all reasonable work expectations of her employer and generally excelled in the performance of her job duties. At no time during her tenure did plaintiff ever receive any disciplinary sanction, counseling, warning, or complaint. As a general practice, plaintiff treated all supervisors, colleagues, and subordinates in a professional manner with fairness, respect, and good will.

B.      Organization of Defendant MB

As a professional association, defendant MB is owned by its shareholders. Although defendant MB is a professional association, at all times relevant, it functioned more as a partnership,

_____

[2] A Schedule K-1 form is used to report a partner's share of the partnership's income, deductions, credits, etc.

demonstrated by, among other circumstances alleged by plaintiff, the fact that each shareholder held an equal number of shares of defendant MB and served as a director and officer of defendant MB. At all times relevant, defendant MB was governed by a board of directors. Each shareholder also served as a director of defendant MB, as required by its bylaws.

Defendant MB conducted its business through regularly occurring special meetings of the board of directors. Although the bylaws did not require defendant MB to state the purpose of a special meeting, defendant MB regularly circulated an agenda prior to the meeting stating the purpose for the meeting and outlining matters to be considered.

The bylaws expressly reserved determination of "admission of new member(s) to the Corporation as Shareholder(s), the expulsion of a Shareholder, or the termination of employment of a Shareholder" to defendant MB's board of directors. (Id. ¶ 35). The bylaws also provided for appointment of officers, including president, managing shareholder, vice president, secretary, treasurer, assistant secretary, and assistant treasurer.

Each shareholder served as an officer of defendant MB in some capacity. During 2016, plaintiff served as vice president and secretary, and defendant Borchers served as managing shareholder. Plaintiff alleges that while the bylaws set forth the duties and responsibilities of defendant MB's officers, in practice, at all times relevant, the only officer with any actual authority was defendant Borchers as managing shareholder. Plaintiff and defendant Borchers were shareholders of defendant MB during 2016. During 2016, there were 25 shareholders of defendant MB, each owning 5,000 shares of defendant MB stock with equal shareholder rights and voting power.

C.    Defendant MB's Management Committee

Defendant MB's board of directors also elected a management committee, consisting of five shareholders, to "manage" defendant MB and "generally carry out such duties as the Board of Directors may delegate from time to time and carry out generally the legal practice and administrative affairs of [defendant MB]." (Id. ¶ 46). Plaintiff alleges that in practice, most of the board of directors' control was delegated to the management committee.

In 2016, the management committee consisted of defendant Borchers, David Beatty ("Beatty"), Alice Bonnen ("Bonnen"), Rohan Saba, and one of the female complainants plaintiff alleges was thereafter "retaliatory remov[ed] by the Board of Directors." (Id. ¶ 47). Defendant Borchers was the longest serving member of the management committee at the time.

Although defendant MB's bylaws gave the management committee authority to "carry out such duties as the Board of Directors may delegate," plaintiff alleges the management committee "controlled" the board of directors in the following ways:

1.    The management committee scheduled all meetings of the board of directors;

2.    The management committee controlled the matters presented to the board of directors by preparing and circulating the agenda for such meetings; and

3.    The management committee, through defendant Borchers as managing shareholder, made its recommendations regarding corporate actions to the board of directors, which were generally followed, as a matter of course.

(Id. ¶ 48).

D.    Defendant MB's Controlling Group of Shareholders

Plaintiff alleges that defendant Borchers was the leading member of a controlling group of

shareholders consisting of David Purks, Scott Hatfield ("Hatfield"), Tim Wall, David Hall, Peter Siddoway, and others.[3] Plaintiff alleges this group of shareholders was responsible for a significant portion of defendant MB's revenues and major client relationships, and was followed by the majority of defendant MB's shareholders as a matter of course. Plaintiff alleges through their control of defendant MB's revenues and major client relationships, this group was able to exercise actual control over the management committee, the board of directors, and defendant MB, although this group did not hold numeric majority of defendant MB shares.

For example, plaintiff alleges in 2015, Ken Sibley ("Sibley"), founder and then-president of defendant MB, recognized that he was not being permitted to exercise the authority given to him as president under the bylaws, and raised this issue with the management committee. In 2016, the management committee presented this issue to the board of directors. Allegedly at the direction of defendant Borchers, with the support of the above-named group, the board of directors decided to consolidate the role of the president with the managing shareholder, and otherwise to recognize that defendant Borchers was already occupying both roles in practice.

E.     Discrimination at Defendant MB

Plaintiff alleges that since at least 2011 through the relevant time period, defendant MB and its shareholders, directors, and officers failed to remediate, and instead fostered, a workplace that was hostile to women and minorities. Plaintiff alleges that an incident occurred wherein a male shareholder commented to a female shareholder that he would be "so far up [her] a** she wouldn't be able to see straight," resulting in the management committee, while plaintiff served on that committee,  discussing "the necessity of setting a professional standard of conduct for the work

_____

[3]  Plaintiff labels this group the "Controlling Group."

environment that would be applicable to all employees" and a working environment which is "pleasant, healthful, comfortable and free from intimidation, hostility or other offense that might interfere with work performance" and which would not tolerate "harassment of any sort; verbal, physical or visual . . . ." (Id. ¶¶ 58-59). Plaintiff alleges, however, that no steps were taken to ensure the workplace was free of harassment.

Plaintiff alleges another instance occurred which resulted in one shareholder leaving defendant MB in 2012 "due in part to the firm's lack of support for women and families." (Id. ¶ 60). Plaintiff further alleges that she witnessed or was told about hiring discrimination against minorities and discrimination against minorities advancing to become shareholders of defendant MB.

Plaintiff alleges defendant MB hired attorney Kevin S. Joyner ("Joyner") of the Ogletree, Deakins, Nash, Smoak & Stewart, P.C. law firm at some point prior to June 2, 2016, to investigate and advise it concerning ongoing claims of gender discrimination, including a hostile work environment, that were asserted by three of defendant MB's female attorneys/employees ("complainants"). As part of his investigation, Joyner met with plaintiff on or about June 2, 2016 to determine her personal knowledge about gender discrimination in defendant MB's workplace. During the course of the interview, which lasted at least one hour, plaintiff allegedly candidly reported her personal knowledge to Joyner about facts that ultimately supported the complainants' concerns about gender discrimination in defendant MB's culture and workplace environment.

During the course of the interview, Joyner informed plaintiff that he did not represent plaintiff. Plaintiff alleges that Joyner used the substantive information provided to him by plaintiff regarding gender discrimination in the workplace in part to prepare a "confidential memorandum"

for defendant MB's board of directors to review. Plaintiff requested and was denied an opportunity to review this memorandum, after which plaintiff consulted an attorney to assist and advise her in connection with Joyner's investigation.

On or about June 14, 2016, Joyner provided defendant MB's board of directors with a copy of the confidential memorandum that included information that plaintiff had provided to him and that confirmed or corroborated gender discrimination existing in defendant MB's work environment. Plaintiff alleges defendant Borchers provided a copy of the confidential memorandum to other attorney-shareholders who were not on the management committee prior to its circulation to members of defendant MB's board of directors.

On or about June 15, 2016, defendant MB held a board of directors meeting to review and discuss Joyner's confidential memorandum among defendant MB's board members. Plaintiff alleges that during defendant MB's board meeting of June 15, 2016, board members "openly excoriated" plaintiff after reviewing the confidential memorandum in at least the following ways:

1. Hatfield openly referred to plaintiff's statements concerning the hostile work environment as "idiotic;"

2. Shortly thereafter, Joyner informed the board members during the board meeting that Hatfield's characterization of plaintiff's concerns was "not accurate;'

3. Another board member responded openly to Joyner's statement that he would have said "much worse [than Hatfield]" in describing his reaction to plaintiff's statements concerning the hostile work environment;

4. Other board members screamed at plaintiff to "grow up" and "stop complaining;" and

5. Other board members chastised plaintiff for having hired a lawyer to advise her after

Joyner's interview of her.

(Id. ¶ 71).

Plaintiff alleges no reproach or reprimand was issued by defendant MB to these other board members. Plaintiff alleges that after the June 15, 2016 meeting, the allegedly controlling group of board members held discussions regarding forcing plaintiff and another female complainant to leave defendant MB. Plaintiff alleges this group and defendant Borchers began exploring possible retaliatory efforts against plaintiff and the other female complainants, including possibly ending the firm's trademark practice, which was led by one of the female complainants.

Following the June 15, 2016 board meeting, defendant MB's shareholder Julie Richardson ("Richardson") told another shareholder that plaintiff "played the black card too much." (Id. ¶ 76). Plaintiff alleges that at that point in time, plaintiff had never made any complaints to defendant MB about "race" or being "black." Plaintiff alleges Richardson "sought to spread the inaccurate and ugly stereotype about African-Americans as being applicable to plaintiff in an effort to discredit and isolate plaintiff from collegiality and support in the workplace and amongst the defendant MB Board of Directors and shareholders in retaliation for having reported gender discrimination to Joyner." (Id. ¶ 77).

On July 8, 2016, Beatty, a defendant MB shareholder and management committee member, prepared and circulated an email to defendant MB's shareholder/employees that referenced plaintiff as a "bad a**hole" for having expressed "sincere concerns" about gender discrimination to Joyner. (Id. ¶ 79). The email stated that defendant MB needed more "good a**holes" instead. (Id.).

On July 11, 2016, at the direction of defendant Borchers and the management committee, Ashley Woodruff ("Woodruff"), defendant MB's director of administration, circulated what

purported to be the complete agenda for a board of directors meeting scheduled for July 13, 2016; however, the agenda did not include consideration of removal of one of the female complainants from the management committee. Plaintiff alleges that nevertheless, during this meeting, defendant MB's board of directors unilaterally expelled one of the complainants as a member of defendant MB's management committee. Plaintiff alleges this was done in retaliation for having complained about the hostile work environment, as was reported in Joyner's confidential memorandum. Plaintiff alleges during this meeting a non-shareholder attorney "openly reprimanded plaintiff for her having expressed sincere concerns about gender discrimination" and directed plaintiff to "leave [the firm] and do better." (Id. ¶ 82).

Defendant MB held a board of directors meeting on July 14, 2016, to discuss the removal of one of the female complainants as a member of the management committee. Prior to the meeting, Sibley noted his disappointment "that a motion of such gravity-which was not on the agenda circulated 7:11 pm Monday evening not postponed by the board, so that partners not present (and who had no idea such a motion would be made) would have an opportunity to participate in the discussion and subsequent vote." (Id. ¶ 84). In the June 14, 2016 meeting, Sibley, along with plaintiff, moved to cancel the removal of one of the female complainants from the management committee. The motion did not carry. Sibley thereafter resigned from defendant MB, a firm he co-founded, on September 14, 2016.

F.      Defendant MB's STL Plan

As part of defendant MB's policies and procedures, defendant MB adopted a short-term leave/short-term disability plan ("STL plan") to "provide greater flexibility for Shareholders to work reduced hours due to personal illness, family leave, or serious family illness or other hardship" and

to establish a plan for short term leave that is "more equitable than addressing individual situations on an ad hoc basis as they arise." (Id. ¶ 87).[4]

Plaintiff alleges that throughout 2016, plaintiff experienced numerous events which qualified her for participation in defendant MB's STL plan. Plaintiff timely notified defendant Borchers and Woodruff throughout 2016 that she was experiencing qualifying events under the STL plan that made it difficult for her to meet her 1600 billable hour requirement. Defendant Borchers and Woodruff followed up with plaintiff periodically to determine whether she was still experiencing the qualifying events and whether she was on track for her work.

Eventually, on or about September 14, 2016, plaintiff elected to participate in defendant MB's STL plan as a qualified applicant under the firm's policies and procedures. Plaintiff alleges that in addition to qualifying to participate in defendant MB's STL plan through her own health condition at the time, plaintiff further qualified for participation due to two additional independent qualifying events that were being experienced by plaintiff's immediate family members.

Prior to plaintiff's election, defendant MB's management committee would ministerially confirm an attorney/employee's STL request and simply inform the board of directors about the attorney/employee's election to participate in the STL plan. Plaintiff alleges that instead of approving plaintiff's election at the typical ministerial management committee level, defendant MB

_____

[4] When ruling on a motion to dismiss, the court may consider the facts as alleged in the complaint, "documents attached to the complaint, . . . [and documents] attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007) (internal citations omitted). Attached to defendants' motion to dismiss are four documents, the employment agreement, the shareholders' agreement, the compensation plan, and the STL plan, all of which are discussed by plaintiff in complaint and proposed amended complaint. Plaintiff has not challenged the authenticity of these documents. Plaintiff argues in motion to amend that these documents are outside the pleadings and should be disregarded, although previously in response in opposition to defendants' motion to dismiss, plaintiff cited to the employment agreement, the shareholders' agreement, and the STL plan and referenced all four documents. (See, e.g., DE 21 at 21, 23-24). The court finds these documents integral to the complaint and authentic; other exhibits submitted by defendant are not integral to the complaint and will not be considered by the court. (See DE 23-3).

subjected plaintiff to "insensitive questioning" about her health at the management committee level and required her to obtain medical documentation for further consideration, which plaintiff alleges was done in retaliation for her participation in the Equal Employment Opportunity ("EEO") investigation and complaints about the controlling group of shareholders. (Id. ¶ 94).[5]

Although plaintiff obtained the requested medical documentation from her physician that confirmed the need for accommodations through the STL plan and offered to provide the same to defendant MB's director of administration, defendant MB informed plaintiff that she instead would need to address defendant MB's board of directors with her request to participate in the STL plan.

Defendant MB placed the issue of plaintiff's STL request on the agenda for the October 19, 2016, meeting of defendant MB's board of directors, allegedly facilitating an open discussion among board members about plaintiff's private health condition, which was an underlying basis for the leave request. During the meeting, defendant Borchers directed plaintiff and one of the female complainants to leave the meeting so that the board could discuss the matter in their absences, allegedly because plaintiff and the female complainant, who had not made any election to participate in the STL plan that year, engaged an attorney to advise and assist them after having been interviewed by Joyner. During that meeting defendant Borchers and the group of controlling shareholders allegedly made their negative opinions towards plaintiff and her STL request known to the other shareholders and directors at the meeting and suggested that plaintiff's request should be denied.

When plaintiff and the female complainant were permitted to return to the meeting, defendant Borchers led a brief discussion amongst the shareholders about plaintiff's STL election.

_____

[5] Presumably plaintiff here is referencing the investigation in response to which defendant MB hired Joyner. (See DE 26-1 at 44).

During this discussion, Richardson intentionally misled the board of directors by stating that Richardson "wrote the policy" which "was for prolonged family illness," and stated that she did not "see how" plaintiff's qualifying events applied to the STL plan. (Id. ¶ 102). Richardson had previously stated the plan was "primarily driven by [a shareholder's] plan for adoption." (Id.). Thereafter, all but three of the approximate 20 board members in attendance voted to deny plaintiff's election to invoke the right to participate in the STL plan.

Plaintiff alleges that defendant MB's board of directors had never previously voted on this issue of STL election as it pertained to its white employees, including those seeking short-term leave for such events as cataract surgery, undisclosed illnesses, and even for one white employee who did not otherwise qualify for the STL plan, but was granted participation by defendant MB nonetheless. Plaintiff additionally alleges that prior to plaintiff's request for STL plan participation, defendant MB had never required any other white shareholders or employees to disclose their specific medical conditions to prove qualification; never required other shareholders or employees to present their request for STL plan participation to the board of directors for approval; and never required the shareholder or employee to present physician statements confirming health conditions.

Following the rejection of plaintiff's election to participate in defendant MB's STL plan, defendant Borchers discussed "punishment" for "bad behavior" and specifically mentioned plaintiff's name along with that of another female complainant for having "hired a lawyer" back in June 2016. (Id. ¶ 107). During the board meeting of October 19, 2016, defendant Borchers also suggested and discussed a range of punishment for plaintiff with defendant MB's board of directors, including public censure, monetary penalties, and termination. The board of directors took up discussion of "Shareholder Conduct," allegedly at the direction of defendant Borchers. (Id. ¶ 110).

During this discussion, two shareholders suggested that defendant MB have a "reset" of relations between shareholders; however, defendant Borchers disagreed that defendant MB could have such a "reset." (Id.).

G.    Further Actions Taken by Board of Directors

After this discussion, the board of directors took up consideration of policy review and revisions, including amendments to the compensation plan, allegedly at the direction of defendant Borchers. Allegedly Beatty proposed making an amendment to the compensation plan that would specifically punish plaintiff if she was unable to meet her billable hour requirements for 2016. Plaintiff alleges this amendment was in violation of defendant MB's "unwritten but widely understood policy of not making policy changes that would negatively impact a specific shareholder at the time of making the policy change." (Id. ¶ 113). This amendment was approved. Thereafter, defendant Borchers unilaterally contacted one of defendant MB's largest clients to inform the client that client management responsibility was being transferred to a member of the controlling group of shareholders, which plaintiff alleges was not in the best interest of defendant MB.

On October 7, 2016, a day following plaintiff's request for STL, but prior to the board's consideration of the request, defendant MB's management committee circulated notes of its meetings held July 26, 2016, August 2, 2016, and August 16, 2016. Plaintiff alleges these notes contained a substantially higher level of detail than notes previously provided to defendant MB's shareholders. The notes allegedly covered a conversation that plaintiff had with defendant MB's shareholder and management committee member Bonnen, but the content included inaccurate statements attributed to plaintiff and contained a critical omission by Bonnen, indicating incorrectly plaintiff's desire to undermine the firm. Thereafter, the management committee did not circulate any

further meeting minutes while plaintiff remained employed by defendant MB.

Plaintiff alleges, in contrast, an additional incident following Joyner's investigation. This incident involved a male shareholder's interaction with a female staff member being described as him addressing the staff member "loudly and angrily" when he yelled and cursed at her and caused her fear. (Id. ¶ 120). Notwithstanding, no mention of his previous similar interactions with a different female staff member were discussed in the management committee meeting nor were statements made regarding remedial measures to be taken.

On or about November 2, 2016, plaintiff alleges she became aware that defendant MB's management committee had openly discussed racial and gender discrimination and its retaliatory actions against plaintiff and the complainants during at least one of its meetings. Plaintiff also became aware that defendant MB's management committee had specifically discussed terminating her and that another shareholder had specifically discussed a motion to terminate plaintiff's employment.

Around November 4, 2016, plaintiff alleges a poorly noticed meeting was called for the shareholders of defendant MB's "ChemBio" practice group of which plaintiff was a member. During this meeting, defendant MB's shareholder/employees "interrogated" plaintiff by asking about her "intentions" and whether she was going to sue the firm. (Id. ¶ 126). Plaintiff alleges that defendant MB's ChemBio practice group further "openly chastised" plaintiff on or about November 4, 2016, for having hired a lawyer. (Id. ¶ 127). Bonnen asked plaintiff at the November 4, 2016 ChemBio practice group meeting what would happen "if somebody pushed" her "off the cliff." (Id. ¶ 128).

Around this period, plaintiff was repeatedly asked to speak with defendant MB's board of

directors to answer "some tough questions." (Id. ¶ 129). On November 5, 2016, defendant Borchers emailed plaintiff to inform that plaintiff was being placed on the agenda for the board of directors meeting scheduled for November 8, 2016, based on a meeting with ChemBio members regarding "workplace concerns" with no further specification. (Id.). Plaintiff subsequently provided defendant MB's management committee with documentation from a health care provider that indicated she needed to avoid stress during this time for health reasons. Plaintiff alleges that defendant MB's hostile work environment had been taking a toll on plaintiff's health by causing her to experience difficulty in breathing through the exacerbation of her asthmatic condition; however, plaintiff continued working through those health issues.

H.      Plaintiff's Resignation

On December 23, 2016, plaintiff tendered her resignation. Plaintiff has obtained employment but her "opportunities for compensation have been significantly diminished." (Id. ¶ 133). On or about January 3, 2017, defendant Borchers and the controlling group of shareholders formed their own firm ("Sage Patent Group"). Plaintiff alleges that the Sage Patent Group registered a website on November 12, 2016 and signed articles of incorporation on December 12, 2016. Plaintiff alleges defendant MB shareholders acknowledged that the Sage Patent Group "used many of us to help them carry the bags out to the car" and "lamented what they were able to easily do in 2016 without meaningful protest." (Id. ¶ 139).

**DISCUSSION**

A.      Standard of Review

A plaintiff may amend complaint one time as a matter of course within 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), whichever is earlier.

17

Fed.R.Civ.P. 15(a). Otherwise, however, a plaintiff may amend complaint only by leave of the court or by written consent of the defendant, although "[t]he court should freely give leave when justice so requires." Id. This liberal rule gives effect to the federal policy in favor of resolving cases on their merits, rather than disposing of them on technicalities. See Ostrzenski v. Seigel, 177 F.3d 245, 252–53 (4th Cir. 1999). Leave to amend should be freely given in the absence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).

With respect to futility, the court may deny leave to amend "if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards." Katyle v. Penn Nat. Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011). A complaint states a claim if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal [the] evidence" required to prove the claim. Twombly, 550 U.S. at 556. In evaluating the complaint, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement [,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009).

Likewise, "[t]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 570). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

B.    Analysis

Plaintiff asserts the following claims:  1) Title VII claims for race-based discrimination and retaliation for plaintiff's participation in the investigation concerning gender discrimination and 2) a § 1981 claim for race discrimination.  In her proposed amended complaint, plaintiff additionally asserts the following claims: 3) a North Carolina claim for breach of fiduciary duty and 4) a North Carolina claim for breach of the implied covenant of good faith and fair dealing.  The court addresses each claim in turn below, holding that for each claim, plaintiff has failed to state a claim on which relief can be granted under the facts alleged in plaintiff's proposed amended complaint.  Thus, the court grants defendant's motion to dismiss plaintiff's first and second claims and denies plaintiff's motion to amend as futile with regard to all additional factual allegations and with regard to plaintiff's third and fourth claims.[6]

1.    Title VII Claims

Title VII contains both antidiscrimination and antiretaliation provisions.  Regarding the former, Title VII in relevant part makes unlawful for an employer to do as follows:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment

---

[6]  The time in which plaintiff could amend her complaint as a matter of right has passed.

opportunities or otherwise adversely affect his <u>status as an employee</u>, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a) (emphasis added). Regarding the latter, Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his <u>employees</u> . . . because he has opposed any practice made an unlawful practice by this subchapter." 42 U.S.C. § 2000e–3(a) (emphasis added). The Supreme Court has held that "Title VII's antiretaliation provision prohibits any employer action that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Thompson v. N. Am. Stainless, LP</u>, 562 U.S. 170, 174 (2011) (citations omitted).

Title VII permits "a person claiming to be aggrieved" to file a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that the employer committed an unlawful employment practice, and, if the EEOC declines to sue the employer, it permits a civil action to "be brought . . . by the person claiming to be aggrieved . . . by the alleged unlawful employment practice." 42 § 2000e–5(b), (f)(1).

"An entity can be held liable in a Title VII action only if it is an 'employer' of the complainant." <u>Butler v. Drive Auto. Indus. of Am., Inc.</u>, 793 F.3d 404, 408 (4th Cir. 2015). Title VII defines an "employer" as "a person who is engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." 42 U.S.C. § 2000e(b). Title VII defines an "employee" only as "an individual employed by an employer." 42 U.S.C. § 2000e(f). The Supreme Court has recognized that this definition "is completely circular and explains nothing." <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 323 (1992) (addressing the question of whether a person was an independent contractor or an employee under the Employee Retirement Income Security Act ("ERISA")).

The Supreme Court has repeatedly held that when a statute contains the term "employee" but does not define it, a court must presume that Congress has incorporated traditional agency law principles in order to determine who is or is not an "employee." See Clackamas Gastroenterology Assocs., P.C. v. Wells, 538 U.S. 440, 444–47 (2003) (addressing whether a director-shareholder physician was an "employee" in determining whether professional corporation was covered by American with Disabilities Act ("ADA"), discussed more below); Nationwide, 503 U.S. at 319, 322-23 (addressing the question of whether a person was an independent contractor or an employee under ERISA and "read[ing] ERISA to incorporate traditional agency law criteria"); Cmty. for Creative Non–Violence v. Reid, 490 U.S. 730, 739–41 (1989) ("We thus agree with the Court of Appeals that the term 'employee' should be understood in light of the general common law of agency.").

Of particular relevance, in Clackamas, the Supreme Court in deciding whether physician shareholders were employees or employers under the ADA, a statute that defines "employee" identically to Title VII, the Court focused on the common law agency doctrine and stated courts should look to the guidelines in the EEOC's Compliance Manual to address the question of when a person is an "employee." The Court turned to the following factors from the EEOC's Compliance Manual in effect at that time: 1) "Whether the organization can hire or fire the individual or set the rules and regulations of the individuals work," 2) "Whether and, if so, to what extent the organization supervises the individual's work," 3) "Whether the individual reports to someone higher in the organization," 4) "Whether and, if so, to what extent the individual is able to influence the organization," 5) "Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts," and 6) "Whether the individual shares in the profits, losses, and

liabilities of the organization." <u>Clackamas</u>, 538 U.S. at 449-50. The Court held that "the answer to whether a shareholder-director is an 'employee' to determine whether the threshold was met depended on 'all of the incidents of the relationship . . . with no one factor being decisive.'" <u>Id.</u> at 450-51 (citations omitted).

Plaintiff first argues that "the sole question for the Court as to this issue is whether Lemon was protected from sex discrimination and retaliation as an 'individual' and 'person aggrieved' under Title VII even if she was a concurrent employee and shareholder for defendant MB," and that the court should liberally construe Title VII in light of its remedial purpose, arguing it is unnecessary for plaintiff to allege she was an employee as defined in <u>Clackamas</u>. (<u>See</u> DE 21 at 11). Plaintiff argues that there is no dispute that defendant MB is an employer within the meaning of Title VII in that defendant MB is an entity that "is engaged in an industry affecting commerce who has fifteen or more employees." (<u>Id.</u> at 15).

Plaintiff's interpretation is inconsistent with the statutory language of Title VII as well as Supreme Court precedent. First, Title VII's substantive antidiscrimination provision prohibits discrimination on the basis of "race, color, religion, sex, and national origin" "with respect to . . . compensation, terms, conditions or privileges of <u>employment</u>," and discriminatory practices that would "'deprive . . . any individual of employment opportunities or otherwise adversely affect his status as an <u>employee</u>.'" 42 U.S.C. § 2000e-2(a) (emphasis added). Although "Title VII should be liberally construed in light of its remedial purpose," <u>Butler</u>, 793 F.3d at 409-10, the court cannot wholly divorce the word "individual" from the rest of 42 U.S.C. § 2000e-2(a), which prevents an employer for discriminating against an individual with respect to that individual's employment or status as an employee. In order for an individual to have employment, that individual must be an

employee in some capacity, even when construing the term employee liberally.

Regarding Title VII's antiretaliation provision, as stated by the Supreme Court, although the statute does not "specify[] the employer acts that are prohibited" and, "unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment," Thompson, 562 U.S. at 174 (citations omitted), the antiretaliation provision still prohibits an employer from "discriminating against any of his employees," 42 U.S.C. § 2000e–3(a) (emphasis added); see also Thompson, 562 U.S. at 177-78 (holding Title VII grants a cause of action to plaintiff who was fired in retaliation for his fiancé's filing of an EEOC charge against their shared employer, as one who "falls within the zone of interests protected by Title VII" as Thompson "was an employee" and "the purpose of Title VII is to protect employees from their employers' unlawful actions").

Additionally, although not directly addressed by the Supreme Court or the Fourth Circuit, multiple court of appeals have held that the term "employee" under Title VII, in order to determine whether the "employer" is subject to liability under Title VII, is defined with reference to the common law agency principles discussed above if not specifically dictated by Clackamas. See, e.g., Mariotti v. Mariotti Bldg. Products, Inc., 714 F.3d 761, 766-77 (3d Cir. 2013) (citing Clackamas and holding "the definitions of 'employer' and 'employee' set forth in both the ADA and Title VII are relevant in resolving (1) whether an entity qualifies as an 'employer' under Title VII, and (2) whether an individual is an 'employee' who 'may invoke [Title VII's] . . . protections against discrimination'"); Lopez v. Massachusetts, 588 F.3d 69, 83 (1st Cir. 2009) ("It is clear that plaintiffs are not HRD's employees, and HRD is therefore not their 'employer' for Title VII purposes, based on [the Clackamas] factors"); Gulino v. N.Y. State Educ. Dep't., 460 F.3d 361, 377–78 (2d Cir.

2006) (citing <u>Clackamas</u> and applying the common law agency test to define an "employee" under Title VII because Supreme Court precedents "require adherence to common law principles of agency in Title VII cases"); <u>Shah v. Deaconess Hosp.</u>, 355 F.3d 496, 499–500 (6th Cir.2004) (citing <u>Clackamas</u>, applying the common law agency test to determine employee status under Title VII, and suggesting that other tests cannot be reconciled with Supreme Court decisions); <u>see also</u> <u>Steelman v. Hirsch</u>, 473 F.3d 124, 130 (4th Cir. 2007) (citing <u>Clackamas</u> and holding plaintiff to not be an employee under the Fair Labor and Standards Act).

Plaintiff next argues that even under the direction provided by the Supreme Court for determining who is an "employee" as found in <u>Clackamas</u>, plaintiff has alleged sufficient facts plausibly showing she has standing to assert claims for sex discrimination and retaliation under Title VII. The court turns to the <u>Clackamas</u> factors.

First, regarding "[w]hether the organization can hire or fire the individual or set the rules and regulations of the individuals work," plaintiff alleges that pursuant to her September 4, 2001 employment agreement, she could have been fired without cause, (Prop. Am. Compl. (DE 26-1) ¶ 20), which would weigh in her favor on this factor. However, it is undisputed January 2, 2007, plaintiff signed a shareholders' agreement which made her an equal owner of the firm along with the other shareholders and which plaintiff paid $62,241.17 for her ownership interest. (<u>See</u> DE 18-2 at 140-144).[7] As a shareholder, plaintiff owned an equal number of shares in the firm as other shareholders, served as a director and officer of the firm, as vice president and secretary in 2016, and had "equal shareholder rights and voting power." (Prop. Am. Compl. ¶¶ 37, 44). According to

---

[7] It is also undisputed that <u>prior</u> to executing the shareholders' agreement, plaintiff was an employee who could be terminated without cause on 30 days' notice, was provided a salary, did not share in the profits or expenses of the law firm, and did not have an ownership interest in the firm or any right to participate in the management of the firm.

plaintiff, shareholders "owned" the firm and the firm "conducted its business through regularly-occurring special meetings of the Board of Directors." (Id. ¶¶ 30, 33). Plaintiff further alleges that only the board of directors could admit, expel, or terminate shareholders and that plaintiff was a member of that board, making her position more as an employer than employee. (Id. ¶¶ 32, 35).[8]

Turning to the second factor, "[w]hether and, if so, to what extent the organization supervises the individual's work," plaintiff alleges that at all times relevant, defendant MB had a strict quality control policy which required plaintiff and "other shareholders to submit their work product for substantive review by another shareholder to ensure that assignments were met satisfactorily and provide Lemon with feedback regarding the same" and submit all draft bills to the managing shareholder "for compliance and [to] take appropriate action as necessary." (Id. ¶¶ 22-23). However, post-completion quality control measures of work products and draft bill compliance review are not equal to supervision or control of plaintiff's work. These allegations do not indicate, for example, that plaintiff's work product was in any way directed by another or that any feedback she received impacted the work product she had completed.

Third, regarding "[w]hether the individual reports to someone higher in the organization," plaintiff alleges that "all attorneys at the firm reported to the Management Committee, and to Borchers as Managing Shareholder." (Id. ¶ 24). However, there is no indication in what way this

---

[8] Plaintiff alleges as relevant that there "was an open discussion by MB's board of directors about a 'range of punishment' for Lemon, including the potential for 'public censure, monetary penalties, and termination.'" (DE 21 at 18 (citing Compl. (DE 1-7) ¶ 46). However, that the board of directors, of which plaintiff was a member, could vote to take action against a shareholder, including plaintiff, indicates plaintiff was a "manager" of the business, as opposed to an employee. See Clackamas, 538 U.S. at 448 ("If the shareholder-directors operate independently and manage the business, they are proprietors and not employees; if they are subject to the firm's control, they are employees") (citations omitted).

"report" occurred, how often, or how it changed plaintiff's or others' work product or work choices, if at all. Plaintiff additionally alleges that she met work expectations and, "[w]hile the Bylaws set forth the duties and responsibility of MB's officers, in practice, and at all times relevant, the only officer with any actual authority was Borchers as Managing Shareholder." (Id. ¶¶ 28, 38). Without more, these allegations fail to indicate that plaintiff reported to someone higher in the organization, where plaintiff alleges only without elaboration that all attorneys "reported" to defendant Borchers, that defendant Borchers was the only one with actual authority, and that plaintiff met work expectations. See Nemet, 591 F.3d at 255 (the court does not consider "bare assertions devoid of further factual enhancement"); Kirleis v. Dickie, McCamey & Chilcote, P.C., No. 06CV1495, 2009 WL 3602008, at *22 (W.D. Pa. Oct. 28, 2009), aff'd, No. 09-4498, 2010 WL 2780927 (3d Cir. July 15, 2010) ("Traditionally, partnerships-law firms are not democracies, and often are dominated by one or a few 'autocratic' partners, but this reality does not render every other partner in the firm an employee even though he or she retains most of the indicia of ownership and control.").

Regarding the fourth factor, "[w]hether and, if so, to what extent the individual is able to influence the organization," plaintiff offers no further factual enhancement that her "equal shareholder rights and voting power," (Prop. Am. Compl. (DE 26-1) ¶ 44), was less influential than that of the other shareholders.

Turning to the fifth factor, "[w]hether the parties intended that the individual be an employee, as expressed in written agreements or contracts," although plaintiff alleges that "no provision of the Shareholders' Agreement superseded Lemon's Employment Agreement" and "the Shareholders' Agreement tied continued ownership of stock to Lemon's continued employment with MB," (id. ¶ 41), these allegations are insufficient to establish that once she became a shareholder

in 2007, she remained an employee for Title VII purposes.  Again, of significance and as stated above, plaintiff alleges that "[a]lthough MB is a professional association, in practice it functioned more as a partnership, demonstrated by, among other circumstances alleged herein, the fact that each shareholder [held] an equal number of shares of MB and [served] as a director and officer of MB." (Id. ¶ 31).  The parties' agreement and contract with defendant MB, as well as plaintiff's allegations, indicate the parties intended plaintiff to be a shareholder, functioning as a partner, not an employee, as characterized by the Clackamas test.

Finally, as to "[w]hether the individual shares in the profits, losses, and liabilities of the organization," plaintiff alleges that after she became a shareholder she "continued to be compensated as an employee," but also states that her "compensation was governed at all relevant times by the Attorney Compensation Plan, which was an addendum to the Employment Agreement." (Id. ¶¶ 24-26, 43).[9]  Turning to the plan, shareholders were not paid a salary but instead were compensated based on several factors, including individual shareholder collections, firm revenue, and firm expenses, which were allocated equally among shareholders.  (See DE 18-3 at 2–5).[10]

Plaintiff further argues the following are relevant to the present inquiry: First, in his investigation, defendant MB's lawyer informed plaintiff prior to interviewing her that he did "not represent" plaintiff but that he represented defendant MB, and second, plaintiff's lack of control over her position at defendant MB is evidenced by the fact she was asked to leave a board meeting, she

---

[9]  As previously stated, although plaintiff argues that defendants "again reference[] materials not contained in the pleadings, which is a tacit admission that there are factual disputes to be resolved in discovery," (DE 35 at 4n2.), presumably referencing the compensation plan, plaintiff specifically cites this plan in proposed amended complaint and does not question the validity of the plan attached to defendants' motion to dismiss.

[10]  Regarding plaintiff's allegation that issuance of a W-2 by defendant MB is indicative of her employee status, (Prop. Am. Compl. (DE 26-1) ¶¶ 25-26), the court does not find the issuance of a W-2 dispositive of the present inquiry. See Bluestein v. Cent. Wisconsin Anesthesiology, S.C., 769 F.3d 944, 955 (7th Cir. 2014) (explaining that receiving a W-2 is not dispositive of an employment relationship and must be evaluated along with the other factors).

was "subjected to a vote by the managing committee and board of directors," and she was excluded from "privileged information" regarding her STL request. (DE 21 at 19).

First, that the law firm's attorney did not represent plaintiff does not indicate she is an employee under the Clackamas test. Second, the Clackamas test does not indicate that those who are part of an organization are employees unless they enjoy absolute control over the terms and conditions of their association with said organization. See Mariotti, 714 F.3d at 761 (holding absence of exclusive control "does not compel a conclusion that an individual who lacks it is an employee entitled to invoke Title VII's protections" as such a conclusion would ignore that the Clackamas factors "pertain[] to business entities that do not vest exclusive control in any one individual."). Likewise, plaintiff's allegation that a "non-shareholder attorney" openly reprimanded plaintiff, directing her to "leave [the firm] and do better," (DE 21 at 18), does not indicate plaintiff's lack of power or control as shareholder.

Plaintiff has failed to allege employee status under any of the of the Clackamas factors. Although plaintiff is correct, as the Third Circuit has stated, that "the Clackamas test is a fact intensive one; therefore, cases requiring application of the test may generally require resolution at the summary judgment stage, rather than at the motion to dismiss stage," Mariotti, 714 F.3d at 768 n.5, at times resolution at the motion to dismiss stage is appropriate where plaintiff has twice failed to allege sufficient facts that she was an employee within the meaning of Title VII.[11]

Accordingly, plaintiff's Title VII claims are dismissed.

---

[11] Generally, plaintiff argues "[t]here is simply nothing that Defendants can point to that would indicate that Lemon at any time exerted control or had the right to exert control or even shared control over the MB organization." (DE 21 at 21). However, it is not defendants' burden to plead that plaintiff is an employee sufficient to bring Title VII claims against her alleged employer. As alleged by plaintiff, she was a shareholder and member of the board of the directors of the institution she seeks to bring claims against, and had the rights of control consistent with that position.

2.      Section 1981 Race Discrimination

Section 1981 provides that "all persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens."  42 U.S.C. § 1981.  This right extends, for example, to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  Id.  The elements required to establish a prima facie case are the same under Title VII and Section 1981.  James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 n.1 (4th Cir. 2004).

To establish a prima facie case of discriminatory denial of an employment benefit, a plaintiff must show that: 1) plaintiff is a member of a protected class; 2) defendant provided a certain benefit to its employees; 3) plaintiff was eligible for the benefit; and 4) plaintiff was not provided the benefit under circumstances giving rise to an inference of discrimination.  Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649-50 (4th Cir. 2002); see also Swierkiewicz v. Sorema N. A., 534 U.S. 506, 510-11 (2002) (holding plaintiff is not required to plead facts that constitute a prima facie case to survive a motion to dismiss).

It is undisputed that plaintiff is a member of a protected class and that defendant provided an STL plan as a benefit to its shareholders, including plaintiff.  Plaintiff alleges that she was qualified to participate in defendant MB's STL plan through not only her own health condition, but also qualified to participate through two additional independent qualifying events that were experienced by her immediate family members.  (See Prop. Am. Compl. (DE 26-1) ¶ 92).  Although defendant disputes plaintiff has sufficiently alleged eligibility, the court assumes without deciding that plaintiff was eligible for participation in the STL plan, and turns attention to whether plaintiff has sufficiently pleaded that she was denied eligibility under circumstances that give rise to an

inference of discrimination.

Plaintiff alleges that prior to plaintiff's election to participate in the STL plan, defendant MB's management committee would ministerially confirm an STL request and simply inform the board of directors. Prior to plaintiff's experience, plaintiff alleges defendant MB's board of directors had never previously voted on this issue of STL election as it pertained to its white employees, nor required white shareholders or employees to disclose their specific medical conditions to prove qualification; never required other shareholders or employees to present their request for STL plan participation to the board of directors for approval; and never required the shareholder or employee to present physician statements confirming health conditions.

The above allegations indicate that plaintiff was treated differently from others who sought to participate in the STL plan. However, the key inquiry under § 1981 is whether plaintiff was treated differently as a result of race discrimination.

The Fourth Circuit has applied Iqbal/Twombly to dismiss a complaint pleading facts that while consistent with discrimination, require speculation to fill in the gaps and therefore fail to nudge the plaintiff's claims across the line from conceivable to plausible:

> The allegations that [the employer] did not hire [plaintiff] because its decision makers were biased is simply too conclusory. Only speculation can fill the gaps in [plaintiff's] complaint – speculation as to why two "non-Black candidates" were selected to fill the positions instead of [plaintiff]. While the allegation that non-Black decisionmakers hired non-Black applicants instead of plaintiff is consistent with discrimination, it does not alone support a reasonable inference that the decisionmakers were motivated by bias . . . . In short, [plaintiff's] complaint stopped short of the line between possibility and plausibility of entitlement to relief.

McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin., 780 F.3d 582, 586 (4th Cir. 2015) (emphasis in original) (citations omitted) (dismissing plaintiff's Title VII discrimination claims at 12(b)(6) stage); see also Coleman v. Maryland Court of Appeals, 626 F.3d 187, 191 (4th

Cir. 2010) ("the complaint fails to establish a plausible basis for believing Broccolina and Coleman were actually similarly situated or that race was the true basis for Coleman's termination"); Francis v. Giacomelli, 588 F.3d 186, 195 (4th Cir. 2009) (affirming dismissal of § 1981 claim because allegations that (1) plaintiff was in a protected class; (2) the defendants were white; and (3) the defendants never terminated white employees in the same manner that the plaintiff was terminated were insufficient "unadorned allegations of wrongdoing").

Although the Supreme Court has stated "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes [of racially discriminatory intent] are playing a role," Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977), here, it is not possible for the court to determine based on plaintiff's allegations whether the white employees who were allowed to participate in the STL plan were similarly situated to plaintiff and thus draw a reasonable inference that a departure from the normal procedural sequence occurred, see Lightner v. City of Wilmington, N.C., 545 F.3d 260, 265 (4th Cir. 2008) ("The similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful.").

Plaintiff alleges only that she qualified for the STL plan for an undisclosed reason and was denied whereas others who were white were not denied "for such events as cataract surgery, undisclosed illness, and even for one Caucasian employee who did not otherwise qualify." (Prop. Am. Compl. (DE 26-1) ¶ 105). This is an insufficient allegation to give rise to a reasonable inference that plaintiff was not allowed to participate in the STL plan for racially-motivated reasons.

Plaintiff highlights general circumstantial and contextual evidence as indicative of discriminatory intent, arguing that she was treated differently from others not of her protected class

based on retaliation for her cooperation in an investigation about discrimination, and that the firm culture encouraged discrimination and retaliation. However, the discrimination alleged by plaintiff involves gender discrimination and retaliation for reporting gender discrimination, whereas plaintiff's claim under § 1981 by necessity applies only to race discrimination. Plaintiff may well have been subjected to gender discrimination and retaliation, but § 1981 addresses only race-based discrimination.

Plaintiff additionally offers the specific allegation that board member Richardson, four months before the board vote was taken to deny plaintiff the STL benefit, told another shareholder that plaintiff "played the black card too much," (DE 21 at 26; Prop. Am. Compl. (DE 26-1) ¶¶ 76-77), arguing also that discriminatory intent can be inferred in that the board asked plaintiff and another complainant to leave a board meeting "so that the board may discuss the matter in their absence." (DE 21 at 27; Prop. Am. Compl. (DE 26-1) ¶ 99). However, plaintiff offers no allegation connecting Richardson's race-based comment in June 2016 to another unknown shareholder to the 17-3 vote of the board of directors four months later denying plaintiff's request to participate in the STL plan or that the board's request that plaintiff leave the board meeting was connected in any way to plaintiff's race. Therefore, plaintiff fails to provide allegations sufficient to allow to the court to determine that plaintiff's claims cross the line from conceivable to plausible that defendants' actions are not just consistent with discrimination but support a reasonable inference that the decisionmakers were motivated by bias. See McCleary-Evans, 780 F.3d at 586.

Turning to plaintiff's specific allegations against defendant Borchers, plaintiff alleges only as follows: 1) "On information and belief, Borchers was instrumental in influencing other board members to treat Lemon differently because of race, as alleged herein"; 2) "On information and

belief, [defendant MB] and Borchers denied Lemon the ability to elect or otherwise participate in the STL plan because she was an African American even though she was otherwise qualified"; 3) "In violation of 42 U.S.C. §1981, [defendant MB] and Borchers denied Lemon the right to make and enforce her contract with [defendant MB] and to have the full and equal benefit of all laws when [defendant MB] and Borchers intentionally discriminated against Lemon because of her race by rejecting her request to participate in [defendant MB's] STL plan even though she was fully qualified for the same"; and 4) defendant Borchers acted with "malice or reckless indifference" to plaintiff's federally protected rights. (Prop. Am. Compl. (DE 26-1) ¶¶ 148-50, 152)).[12] These allegations do not offer more than "bare assertions devoid of further factual enhancement," Nemet, 591 F.3d at 255, and as such are insufficient.

Accordingly, plaintiff's § 1981 claim is dismissed.

3.      Breach of Fiduciary Duty

Under North Carolina law, the elements of breach of fiduciary duty are as follows: 1) the existence of a fiduciary duty; 2) breach of that fiduciary duty; and 3) damages resulting from that breach. Green v. Freeman, 367 N.C. 136, 141 (2013). As stated by the North Carolina Supreme Court:

> For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties. Such a relationship has been broadly defined by this Court as one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of

---

[12] Plaintiff additionally alleges defendant Borchers "discussed 'punishment' for 'bad behavior' and specifically mentioned Lemon's name along with that of another female complainant for having 'hired a lawyer' back in June 2016 to discuss the sincere concerns each had about MB's gender discrimination and its hostile work environment towards female attorneys and employees" and that during the October 19, 2016, board meeting "Borchers also suggested and discussed a range of punishment for Lemon." (Prop. Am. Compl. (DE 26-1) ¶¶ 107-108)). However, as stated above, these allegations do not provide a basis to conclude a reasonable inference that defendant Borchers was motivated by racial bias.

the one reposing confidence . . . [and] it extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and resulting domination and influence on the other.

Dalton v. Camp, 353 N.C. 647, 651 (2001) (citations omitted).

In North Carolina, directors and officers have certain fiduciary duties, including duties to act in good faith, with the care of an ordinarily prudent person in similar circumstances, and in the best interests of the corporation. N.C. Gen. Stat. §§ 55-8-30, 55-8-42. While shareholders generally do not owe duties to one another, the North Carolina Supreme Court has "held . . . that the majority stockholder of a corporation owes fiduciary duties to the minority stockholders." Corwin as Tr. for Beatrice Corwin Living Irrevocable Tr. v. British Am. Tobacco PLC, 821 S.E.2d 729, 730 (N.C. 2018) (citing Gaines v. Long Manufacturing Company, 234 N.C. 340, 344 (1951)). The fiduciary duty owed by controlling shareholders includes "the duty to exercise good faith, care, and diligence to make the property of the corporation produce the largest possible amount" and "to protect the interests of the holders of the minority of the stock . . . ." Gaines, 234 N.C. at 344. Although North Carolina requires certain claims against a director or officer to be brought derivatively on behalf of the corporation, there are two exceptions to this general rule which allow a plaintiff to bring a claim for breach of fiduciary duty directly: (1) where "the wrongdoer owed him a special duty" or (2) where "the injury suffered by the shareholder is separate and distinct from the injury sustained by the other shareholders or the corporation itself." Barger v. McCoy Hillard & Parks, 346 N.C. 650, 659 (1997).

Plaintiff argues she has sufficiently alleged the existence of a fiduciary duty in that "the proposed amended complaint alleges that Borchers served as an officer, director, and controlling shareholder of MB, each of which gives rise to a fiduciary relationship to Lemon and MB pursuant

to North Carolina law." (DE 27 at 13).

a. Controlling Shareholders of Defendant MB

Plaintiff's primary argument that such a duty exists is that defendant Borchers and the other "controlling group of shareholders"[13] effectively controlled defendant MB, thus creating a fiduciary relationship between these controlling shareholders and plaintiff, a minority shareholder. Specifically, plaintiff alleges control as follows:

> Borchers, along with the Controlling Group, exercised actual control over MB in at least the following ways:

> a.      They controlled the Management Committee through Borchers, who led discussion amongst the Management Committee and influenced its decisions;

> b.      They controlled the Board of Directors through the Management Committee by setting special Board of Directors meetings, preparing and circulating agendas, and making recommendations which the Board of Directors would approve as a matter of course;

> c.      They unilaterally removed one of the female complainants from the Management Committee to stifle a dissenting voice;

> d.      They controlled the firm's revenues and the abilities of other shareholders to earn more than their base compensation through their control of major client relationships, and controlled the firm's billing through Borchers's authority and oversight;

> e.      They expressly excluded individuals outside of the Controlling Group from exercising control, including by giving Borchers consolidated authority of MB's President and Managing Shareholder and otherwise disregarding the authority of other officers; and

> f.      They manipulated the flow of information from the Management Committee to the Board of Directors and Shareholders by including factually incorrect statements, delaying the release of minutes to prejudice directors and shareholders against Lemon, and outright failing to release certain other minutes.

---

[13] Plaintiff alleges this group included "others," but does not identify who those others may be of the 25 shareholders of defendant MB in 2016.

(Prop. Am. Compl. (DE 26-1) ¶ 167; DE 27 at 13-14).

However, the proposed amended complaint also states that "each shareholder [held] an equal number of shares of MB and [served] as a director and officer of MB," "[e]ach MB shareholder also served as a director of MB, as required by the Bylaws," and "[e]ach MB shareholder served as an officer of MB in some capacity." (Prop. Am. Compl. (DE 26-1) ¶¶ 31–32, 37). For 2016, the year that is the focus of plaintiff's allegations, "there were twenty-five (25) shareholders of MB, each owning 5,000 share of MB stock with equal shareholder rights and voting power." (Id. ¶ 44). In other words, every shareholder, including plaintiff, owned the same percentage of shares that defendant Borchers did, four percent; the entire alleged controlling group of six shareholders owned 24 percent of the shares of defendant MB in 2016; every shareholder, including plaintiff, was an officer; and every shareholder, including plaintiff, was an equal voting member of the board of directors.

The court finds instructive the North Carolina Supreme Court's recent decision in Corwin, wherein the court confirmed majority stockholders owe fiduciary duties to minority stockholders, expressly declined to determine whether minority stockholders can owe fiduciary duties to other stockholders, and held even if such a duty existed "the complaint in this case would still fail to state a claim upon which relief can be granted because the Complaint does not adequately allege that BAT exercised actual control over the Reynolds board here." 821 S.E.2d at 730. Turning to Delaware law and assessing whether actual control had been exercised, the court stated as follows:

> This inquiry focuses on actual control over the board of directors. Actual control exists only when the allegedly controlling stockholder "exercises such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control." As a necessary prerequisite for a minority stockholder to exercise actual control, then, the stockholder's "power must be so potent that independent directors . . . cannot freely exercise their judgment,

fearing retribution." . . . . the [c]omplaint must contain well-pled facts showing that the minority stockholder 'exercised actual domination and control over . . . [the] directors.'" Even at the motion to dismiss stage, Delaware courts have noted that "[t]his actual control test is 'not an easy one to satisfy' as 'stockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark.'"

That the actual control standard emphasizes the exercise of actual control over the board—an affirmative act by the minority stockholder—and not just the mere possession of power means that an allegation that a minority stockholder has some leverage over the board of directors is not enough. A party may, after all, use its leverage to negotiate favorable terms in a transaction with another party even when it has no control (and thus has exercised no control) over that other party. Applying this standard in the context of a Rule 12(b)(6) motion, plaintiff's Complaint necessarily fails if it "reveals the absence of facts" that BAT engaged in some affirmative act to direct or compel the Reynolds board to enter into the Lorillard transaction on the terms that plaintiff takes issue with here. In other words, the complaint must allege, through well-pleaded facts, actual control, which refers to control that prevents a company's directors from "freely exercis[ing] their judgment in determining whether or not to approve and recommend" a transaction.

Id. at 730 (citations omitted).

Plaintiff's allegations fall short of sufficiently alleging defendant Borchers and the five other shareholders's "power [was] so potent that independent directors . . . cannot freely exercise their judgment, fearing retribution,"id., where plaintiff alleges this group owned 24 percent of defendant MB and held equal voting rights with all other shareholders. In Corwin, by contrast, the alleged controlling stockholder, British American Tobacco PLC, owned 42 percent of the company and had certain additional rights and powers under a governance agreement and the court still found allegations of control inadequate.

Plaintiff argues she has alleged sufficient facts under the standard set by Corwin, in that plaintiff alleged the group had "control of MB's revenues and major client relationships and exercised actual control of the firm in practice through threats and intimidation." (DE 35 at 7 (citing Prop. Am. Compl. (DE 26-1) ¶¶ 50-52, 107-108)). However, the allegations in the paragraphs cited

by plaintiff do not support plaintiff's argument and contain only unexplained and unsubstantiated allegations of control, that this group of "responsible for a significant portion of MB's revenues and major relationships, and was followed by the majority of MB's shareholders as a matter of course," and that defendant Borchers at board meetings "discussed," "mentioned" and "suggested" various actions to be taken by the board against plaintiff. (Prop. Am. Compl. (DE 26-1) ¶¶ 50-52, 107-108)). Such allegations are insufficient where plaintiff offers no indication that defendant Borchers and the alleged controlling group of shareholders made the board take any action it would not have otherwise taken nor that this group in any way threatened or intimidated the board. See Corwin, S.E.2d at 730 ("Although BAT could stop this transaction from happening, BAT could not make it happen . . . . Plaintiff does not allege that BAT ever threatened the Reynolds board in any way.").

      b.    Barger Exceptions

Separately, plaintiff argues that under the North Carolina Supreme Court's decision in Barger, plaintiff has sufficiently alleged circumstances that allow her as a shareholder to bring claims against officers directly, rather than derivatively, where there is a special relationship or individual loss. (DE 35 at 5); see Green, 367 N.C. at 143 ("Thus, we next consider whether plaintiffs can recover under the special duty or unique personal injury exception").

First, plaintiff argues "Borchers (and Others) owed Lemon special duties by nature of Borchers's status as controlling shareholder, officer, and director of MB, as well as her status as Lemon's law partner." (DE 27 at 14).[14] As already discussed above, plaintiff has failed to allege

---

[14] Plaintiff's argument that defendant Borchers and plaintiff have a special relationship due to defendant Borchers's status as "law partner" is inconsistent with plaintiff's allegation that "[a]lthough MB is a professional association, in practice it functioned more as a partnership, demonstrated by, among other circumstances alleged herein, the fact that each shareholder [held] an equal number of shares of MB and [served] as a director and officer of MB." (Prop. Am. Compl. (DE 26-1) ¶ 31).

Borchers's status as controlling shareholder.  See Corwin, 821 S.E.2d at 730 ("In this case, whether plaintiff had standing to bring a direct claim under the first exception depends on whether BAT was a controlling stockholder that owed plaintiff fiduciary duties.").  Regarding defendant Borchers's status as officer, director, or law partner, plaintiff argues only the proposed amended complaint "invokes the 'special protection' afforded to "minority shareholders in a close corporation.'"  (DE 35 at 6 (citing Rivers v. Wachovia Corp., 665 F.3d 610 (4th Cir. 2011)).

In Rivers, the Fourth Circuit discussed Norman v. Nash Johnson & Sons' Farms, Inc., 140 N.C.App. 390 (2000) as extending "special protection to minority shareholders in a closely held corporation," under North Carolina law.  665 F.3d at 617–18.  However, in neither Rivers, nor Norman, nor in the cases cited by Rivers or Norman, is the special protection afforded to minority shareholders extended in such a way to include what plaintiff currently alleges, that there exists a special relationship between plaintiff and defendant Borchers due solely to Borchers's status as an officer, director, or law partner.  See, e.g., Rivers, 665 F.3d at 618 ("Absent any allegation that Rivers was party to a separate contract with the defendants which created distinct duties personal to him, or that he was individually subject to misleading inducements outside the officer-shareholder relationship, Rivers 'fails to set forth any allegations which, even taken as true, support a special duty between [him] and defendants.'") (citing Energy Investors Fund, L.P. v. Metric Constructors, Inc., 351 N.C. 331, 525 S.E.2d 441, 444 (2000)); Norman, 140 N.C. App. at 407 ("Here, plaintiffs allege that defendants are acting in concert, that defendants own the majority of the stock in the Company, are the officers of the Company, and control the Company's Board of Directors. These allegations are sufficient to give rise to a fiduciary relationship between plaintiffs and the defendants and establish that defendants owed plaintiffs a 'special duty' within the meaning of the Barger

decision.").

Plaintiff has not cited, nor is the court aware, of any case law invoking the first <u>Barger</u> exception the way in which plaintiff here proposes or based on such limited allegations. As stated in <u>Barger</u>:

> The existence of a special duty thus would be established by facts showing that defendants owed a duty to plaintiffs that was personal to plaintiffs as shareholders and was separate and distinct from the duty defendants owed the corporation. A special duty therefore has been found when the wrongful actions of a party induced an individual to become a shareholder . . .; when a party violated its fiduciary duty to the shareholder . . .; when the party performed individualized services directly for the shareholder . . .; and when a party undertook to advise shareholders independently of the corporation . . . . This list is illustrative; it is not an exclusive list of all factual situations in which a special duty may be found.

346 N.C. at 659 (citations omitted). Accordingly, plaintiff has failed to sufficiently allege a special relationship based solely on defendant Borchers status as officer, director, or law partner.

Second, plaintiff argues she has alleged "separate and distinct harm" sufficient to bring a direct claim under the second <u>Barger</u> exception. Plaintiff alleges that she worked through health issues after being denied qualification for the STL plan; resigned due to "stress, humiliation, and hostile work environment"; "opportunities for compensation have been significantly diminished," although plaintiff has found employment; and, more comprehensively:

> As a result of the breaches of fiduciary duties to MB by Borchers, Lemon suffered separate and distinct injuries, including denial of her STL/STD claim, amendment of the Attorney Compensation Plan solely to penalize Lemon, and promotion of a hostile work environment to cause Lemon to terminate her employment, all in retaliation for Lemon voicing sincere concerns about discrimination at MB.

(Prop. Am. Compl. (DE 26-1) ¶¶ 131-33, 178).

Although it is clear the damages claimed by plaintiff are unique to her, such damages are not the sort of damages that would bring plaintiff's claim for breach of fiduciary duty under the <u>Barger</u>

exception under the facts alleged here. As stated in <u>Barger</u>, a shareholder may bring a direct claim where "the injury suffered by the shareholder is separate and distinct <u>from the injury sustained by the other shareholders or the corporation itself</u>." 346 N.C. at 650 (emphasis added). Here, plaintiff alleges no injury to other shareholders or the corporation itself. Additionally, plaintiff provides no reasoning or case law, nor is the court aware of any, where a court has applied the second <u>Barger</u> exception to allow a plaintiff shareholder to pursue a cause of action in circumstances even somewhat similar to those alleged here. <u>See, e.g.</u>, <u>Energy Inv'rs Fund, L.P.</u>, 351 N.C. at 336 ("In applying this rule of shareholder law to that of limited partnerships, we find that the complaint shows EIF's injury is the loss of its investment, which is identical to the injury suffered by the other limited partners and by the partnership as a whole . . . . The complaint does not allege a basis demonstrating that the investment, and thus the injury, is peculiar or personal to the limited partner, EIF."); <u>Rivers</u>, 665 F.3d at 618 ("A common example of a distinct injury is a 'claim of stock dilution and a corresponding reduction in a shareholder's voting power.' Fletcher Cyclopedia § 5913.").

In sum, plaintiff has failed to allege the existence of a fiduciary duty and therefore fails to state a claim for relief for breach of fiduciary duty.[15]

4.      Breach of Implied Covenant of Good Faith and Fair Dealing

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive <u>the benefits of the agreement</u>."

---

[15] Additionally, even if plaintiff could show that defendant Borchers owed plaintiff a fiduciary duty, plaintiff has failed to allege that defendant Borchers has breached that duty where plaintiff alleges that the board of directors, not defendant Borchers, made the decision to deny her request for short-term leave and made the decision to amend the compensation plan. (Prop. Am. Compl. (DE 26-1) ¶¶ 104, 114). Plaintiff argues that "[t]o the extent any misconduct was alleged to have been taken solely by the Board, such misconduct is directly tied to Borchers's control." (DE 35 at 9). However, as already held by the court, plaintiff has failed to allege Borchers or the other allegedly controlling shareholders in fact controlled the board.

Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985) (emphasis added). "[T]he implied duty of good faith and fair dealing only arises where a party to a contract performs its contractual obligations in bad faith, and such breach of the implied duty serves as a cognizable basis for a breach of contract." Suntrust Mortgage, Inc. v. Busby, 651 F. Supp. 2d 472, 487 (W.D.N.C. 2009).

Here, plaintiff has not alleged that defendants breached the two contracts potentially at issue, the employment agreement or the shareholders' agreement. Plaintiff argues, however, that her "standalone claim for breach of the implied covenant of good faith and fair dealing . . . is grounded in the fiduciary duty owed by Borchers as a controlling shareholder . . . ." (DE 35 at 9). However, the court has rejected this argument above and rejects it here as well.

Additionally, plaintiff has failed to allege that she has been denied the benefits of the bargain of the two contracts at issue. Although plaintiff argues that she was deprived of the benefits of the bargain of these contracts in that she has been treated unlike other shareholders and has been treated unfairly, (see DE 35 at 10), and in that defendants "den[ied] her STL, chang[ed] the Attorney Compensation Plan . . . foster[ed] a hostile work environment, and otherwise discriminat[ed] and retaliat[ed] against her, (Prop. Am. Compl. (DE 26-1) ¶¶ 184-186), plaintiff does not explain how these alleged breaches deprived her of any benefit she was entitled to under the contracts at issue. Plaintiff has not alleged the STL policy is a contract or connected to the contracts at issue. Similarly, plaintiff alleges the compensation plan was an "addendum" to the employment agreement, (id. ¶ 27), but does not contend that defendant MB breached that plan or deprived her of any benefit she was entitled to under the plan.[16] Plaintiff also does not allege any connection between the employment agreement or shareholders' agreement and plaintiff's allegations concerning

---

[16] Plaintiff alleges that defendant MB changed the compensation plan to punish her but does not contest the board of directors' authority to make changes to the plan.

discrimination and hostile work environment.

In sum, plaintiff fails to state a claim for relief for breach of implied covenant of good faith and fair dealing.

## CONCLUSION

Based on the foregoing, defendants' motion to dismiss (DE 17) is GRANTED. Plaintiff's motion to amend complaint (DE 26) is DENIED. Plaintiff's claims against defendants are DISMISSED WITHOUT PREJUDICE. The clerk is DIRECTED to close the case.

SO ORDERED, this the 11th day of March, 2019.


LOUISE W. FLANAGAN
United States District Judge